UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTOR ANDREWS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>– against –<br><br>BLICK ART MATERIALS, LLC,<br><br>Defendant. | MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED R. CIV. P 12(b)(6)<br><br>17-CV-767 |

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 0 1 2017 ★
BROOKLYN OFFICE

**JACK B. WEINSTEIN, Senior United States District Judge:**

| PARTIES | APPEARANCES |
|---|---|
| **Victor Andrews** | Anne Seeling<br>C.K. Lee<br>Lee Litigation Group, PLLC<br>30 East 39th Street, 2nd Floor<br>New York, NY 10016 |
| **Blick Art Materials, LLC** | David Seth Korzenik<br>Terrence Patrick Keegan<br>Miller Korzenik Sommers LLP<br>488 Madison Avenue, Suite 1120<br>New York, NY 10022<br><br>Steve Baron<br>Steven Mandell<br>Mandell Menkes LLC<br>1 North Franklin Street, Suite 3600<br>Chicago, IL 60606 |



## Table of Contents

I. Introduction ........................................................................................... 2

II. Factual Allegations ............................................................................... 3

III. Legal Standard ..................................................................................... 5

IV. Law ....................................................................................................... 6

    A. Americans with Disabilities Act ...................................................... 6

        1) Third, Sixth, Ninth, and Eleventh Circuit Precedent ................. 8

        2) First and Seventh Circuit Precedent .......................................... 11

        3) Second Circuit Precedent ............................................................ 13

        4) The ADA's Text and Structure ................................................... 16

        5) The ADA's Purpose .................................................................... 19

        6) Avoidance of Absurd Results ..................................................... 21

        7) Plaintiff States a Claim Under the ADA .................................... 24

    B. New York State Human Rights Law and New York State Civil Rights Law ..................................................................................................... 25

    C. New York City Human Rights Law ................................................ 28

V. Defendant's Remaining Arguments ...................................................... 29

    A. Primary Jurisdiction Doctrine ........................................................ 29

    B. Due Process ..................................................................................... 33

VI. Conclusion .......................................................................................... 36

VII. Directions for Further Action in the Litigation ................................ 36

## I. Introduction

The question presented is whether a large retail store chain with an online presence must ensure that its website is accessible to the visually impaired. It reveals problems that have dogged American society: discrimination, access to public accommodations, and how technology has the power to both ameliorate and exacerbate barriers to integration.

The Supreme Court reminds us:

> While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. *The forces and directions of the Internet are so new*, so protean, and so far reaching that *courts must be conscious that what they say today might be obsolete tomorrow*.

2

*Packingham v. North Carolina*, 582 U.S. \_\_\_\_ at 6 (2017) (emphasis added). *See also id.* at 8 ("In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."). The plaintiff seeks the chance to participate in a society transformed by the "new," "protean," and "far reaching" influence of the Internet.

Victor Andrews, who is legally blind, is suing Blick Art Materials, LLC ("Blick") for discriminating against him based on his disability—in violation of federal, state, and local disability laws. He is unable to use Blick's website, "dickblick.com," to purchase the defendant's art products.

Blick moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, or, in the alternative, for dismissal based on the primary jurisdiction doctrine or a violation of defendant's due process rights.

The motion is denied. Andrews has a substantive right to obtain effective access to Blick's website to make purchases, learn about products, and enjoy the other goods, services, accommodations, and privileges the defendant's website provides to the general public.

He may have the right to rely upon procedural methods to enforce those rights by a class action. *See* Fed. R. Civ. P. 23(b)(2). That issue is not now decided. It will depend on the results of a forthcoming "Science Day" to explore the technology available to enable the "blind to see" websites, and a motion by the parties for summary judgment to explore how burdensome it would be for the defendant to make its website compatible with available technology.

## II.  Factual Allegations

Blick owns and operates nationwide brick-and-mortar retail stores that sell art supplies. There are seven Blick stores in New York State. Compl. at ¶ 31. Blick also owns

dickblick.com, through which it sells art supplies directly to consumers for home delivery. *Id.* at ¶¶ 32-33.

Though there are allegedly "well-established guidelines for making websites accessible to blind people," dickblick.com does not follow those guidelines, rendering the website inaccessible to those who are visually impaired. *Id.* at ¶¶ 38-45. Plaintiff, who is blind, alleges that the inaccessibility of Blick's website "denie[s] [blind individuals] equal access to Blick Stores, as well as to the numerous goods, services and benefits offered to the public through Dickblick.com." *Id.* at ¶ 35.

In a conclusory fashion, the plaintiff states that "Dickblick.com . . . contains access barriers which deny full and equal access to Plaintiff, who would otherwise use Dickblick.com and who would otherwise be able to fully and equally enjoy the benefits and services of Blick Stores in New York State." *Id.* at ¶ 47. Andrews makes specific allegations about being unable to complete purchases or use dickblick.com. *See id.* at ¶¶ 48-49. He does not allege that he was unable to purchase art supplies from Blick because of these issues. Instead, he alleges that "[d]ue to Dickblick.com's inaccessibility, . . . blind customers must . . . spend time, energy, and/or money to make their purchases at a Blick store[]. . . . [I]f Dickblick.com was accessible, a blind person could independently investigate products and programs and make purchases via the Internet as sighted individuals can and do." *Id.* at ¶ 45.

In reviewing defendant's motion to dismiss for failure to state a claim, the court must explore dickblick.com in some depth, and it takes judicial notice of its features and the information posted there. *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n. 8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's

authenticity is not in dispute and it is capable of accurate and ready determination.") (internal quotation marks omitted).

The website appears to offers goods and services to the public independent of any goods or services being offered at retail locations. For example, a coupon code that appeared on a banner at the top of the webpage promises free shipping and discounts on orders of items of a certain value specified that the "[o]ffer [was] not valid at Blick Retail stores." http://www.dickblick.com/landing/specialoffer/ (last visited on July 18, 2017). The website also contains a disclaimer stating that "[p]rices, promotions, and availability may vary by store, catalog, and online." http://www.dickblick.com/cart/ (last visited on July 18, 2017).

Two aspects of the website related to Blick's retail stores are the "store locator," which lists the addresses and phone numbers of Blick's retail locations in each state with a store, and the ability to make a purchase online for pickup at a Blick retail store. Compl. at ¶ 34(a)-(b). There is also a way to sign up to receive emails containing news and promotions—customers can choose to register for the "Blick Online Email List" to receive "Online Promotions," the "Blick Store Email List" to receive "in-store promotions and events," or both. http://www.dickblick.com/requests/mailinglist/ (last visited on July 18, 2017).

### III. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, we accept as true all

factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

IV. **Law**

### A. Americans with Disabilities Act

"To state a claim under Title III [of the Americans with Disabilities Act ("ADA" or "the Act")], [a plaintiff] must allege (1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her a full and equal opportunity to enjoy the services defendants provide." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008). The last two elements are contested.

Andrews contends that dickblick.com is either a public accommodation, a place of public accommodation, or a good, service, facility, privilege, advantage, or accommodation of a place of public accommodation as those terms are defined by the ADA and related regulations. Blick believes that a mere cyber presence is not a "place of public accommodation," and therefore the website does not fall within the ambit of Title III.

Resolving this motion requires interpretation of the ADA. When interpreting a statute, courts "turn to the overall statute and its context" and "employ the traditional tools of statutory construction." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017) (internal quotation marks omitted). They examine "the statutory text, structure, and purpose as reflected in its legislative history." *Id.* If the "language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," the inquiry ends. *United States v. Gagliardi*, 506 F.3d 140, 145 (2d Cir. 2007) (internal quotation

6

marks omitted). "If the statutory text is ambiguous, [they turn to] canons of statutory construction." *Catskill*, 846 F.3d at 512.

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations *of any place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). As indicated below, the critical question is whether a website such as Blick's is a "place."

> Discrimination includes

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

*Id.* § 12182(b)(2)(A)(ii). It also includes

> a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

*Id.* § 12182(b)(2)(A)(iii). The statute defines "public accommodation" as follows:

> The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

> (B) a restaurant, bar, or other establishment serving food or drink;

7

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

*Id.* § 12181(7).

If a website is a place of public accommodation under the conditions of the present case, a "failure to take such steps as may be necessary to ensure that no individual with a disability is excluded" from the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of" the website violates the law. The statute does not contain a definition of the term "place of public accommodation."

### 1) Third, Sixth, Ninth, and Eleventh Circuit Precedent

There is a split among the courts on the issue of whether only a physical structure may be a "place" of public accommodation.

The Courts of Appeals for the Third, Sixth, Ninth, and Eleventh Circuits hold that the statute is unambiguous: "places of public accommodation" are physical structures, and the only goods and services that a disabled person has a "full and equal" right to enjoy are those offered at a physical location. Discrimination only exists if the discriminatory conduct has a "nexus" to the goods and services of a physical location.

They base their conclusion largely on the text of the statute, which lists physical locales as "public accommodations." *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612-13 (3d Cir. 1998) ("The plain meaning of Title III is that a public accommodation is a place. . . . This is in keeping with the host of examples of public accommodations provided by the ADA, all of which refer to places."); *Peoples v. Discover Financial Services, Inc.*, 387 F. App'x 179, 183 (3d Cir. 2010) ("Our court is among those that have taken the position that the term [public accommodation] is limited to physical accommodations."); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010-11 (6th Cir. 1997) (*en banc*) ("As is evident by § 12187(7), a public accommodation is a physical place and this Court has previously so held."); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000) ("Title III provides an extensive list of 'public accommodations' in § 12181(7) . . . All the items on this list, however, have something in common. They are actual, physical places where goods or services are open to the public, and places where the public gets those goods or services. . . . [T]his context suggests that some connection between the good or service complained of and an actual physical place is required."); *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1282 (11th Cir. 2002) ("Title III encompasses a claim involving telephonic procedures that, in this case, tend to screen out disabled persons from participation in a competition held in a tangible public accommodation.").

This narrow physical approach means, in practice, that the inaccessible website of a

brick-and-mortar retail store could run afoul of the ADA if the website's inaccessibility

interferes with the "full and equal enjoyment" of the goods and services offered at the physical

store, but a business that operates solely through the Internet and has no customer-facing

physical location is under no obligation to make their website accessible. In a case against the

retail giant Target concerning the accessibility of its website, Target.com, a district court in the

Ninth Circuit held:

> Target.com also allows a customer to perform functions related to Target stores.
> For example, through Target.com, a customer can access information on store
> locations and hours, refill a prescription or order photo prints for pick-up at a store,
> and print coupons to redeem at a store. . . . [T]he court finds that *to the extent that*
> *plaintiffs allege that the inaccessibility of Target.com impedes the full and equal*
> *enjoyment of goods and services offered in Target stores, the plaintiffs state a claim*,
> and the motion to dismiss is denied. To the extent that Target.com offers
> information and services unconnected to Target stores, which do not affect the
> enjoyment of goods and services offered in Target stores, the plaintiffs fail to state
> a claim under Title III of the ADA.

*See Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 949-56 (N.D. Cal. 2006)

(emphasis added); *see also Gil v. Winn Dixie Stores, Inc.*, 2017 WL 2609330, at *5 (S.D. Fla.

Mar. 15, 2017) (denying defendant's motion for judgment as a matter of law because "it appears

that, just as in *Target Corp.*, Winn-Dixie's website is heavily integrated with, and in many ways

operates as a gateway to, Winn-Dixie's physical store locations," but declining to "determine

whether Winn-Dixie's website is a public accommodation in and of itself."); *Young v. Facebook,*

*Inc.*, 790 F. Supp. 2d 1110, 1115 (N.D. Cal. 2011) ("Under controlling Ninth Circuit authority,

'places of public accommodation' under the ADA are limited to actual physical spaces . . .

Facebook operates only in cyberspace, and is thus is not a 'place of public accommodation' as

construed by the Ninth Circuit. While Facebook's physical headquarters obviously is a physical

space, it is not a place where the online services to which [the plaintiff] claims she was denied

access are offered to the public."); *Gomez v. Bang & Olufsen Am., Inc.*, 2017 WL 1957182, at \*4 (S.D. Fla. Feb. 2, 2017) ("All the ADA requires is that, if a retailer chooses to have a website, the website cannot impede a disabled person's full use and enjoyment of the brick-and-motar [*sic*] store. . . . Because Plaintiff has not alleged that Defendant's website impeded his personal use of Bang and Olfusen's retail locations, his ADA claim must be dismissed.").

### 2) First and Seventh Circuit Precedent

By contrast, the Courts of Appeals for the First and Seventh Circuits, while also holding that the ADA is unambiguous, reach the conclusion that "places of public accommodation" need not be physical structures, and discrimination may occur when the goods or services of a "place of public accommodation" are enjoyed by customers who never visit a physical location. These courts have primarily relied on the use of the word "of"—as compared to "at" or "in—in 42 U.S.C. § 12182(a), and the inclusion of "travel service" in the statute's list of public accommodations, a type of business at the time of the statute's passage that often did not have a physical location.

In *Carparts Distribution Center., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.*, the Court of Appeals for the First Circuit held:

> By including "travel service" among the list of services considered "public accommodations," *Congress clearly contemplated that "service establishments" include providers of services which do not require a person to physically enter an actual physical structure*. Many travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services . . . To exclude this broad category of businesses from the reach of Title III and limit the application of Title III to physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.

37 F.3d 12, 19-20 (1st Cir. 1994) (emphasis added).

In *Doe v. Mutual of Omaha Insurance Co.*, the Court of Appeals for the Seventh Circuit

held that the

> core meaning of [section 302(a) of Title III of the ADA], plainly enough, is that the
> owner or operator of a store, hotel, restaurant, dentist's office, travel agency,
> theater, Web site, or other facility (whether in physical space or in electronic space,
> that is open to the public cannot exclude disabled persons from entering the facility
> and, once in, from using the facility in the same way that the nondisabled do.

179 F.3d 557, 559 (7th Cir. 1999) (internal citation omitted). The same court held in *Morgan v.*

*Joint Administrative Board, Retirement Plan of the Pillsbury Co. and American Federation of*

*Grain Millers, AFL–CIO–CLC*:

> The defendant asks us to interpret "public accommodation" literally, as denoting a
> physical site, such as a store or hotel but we have already rejected that
> interpretation. An insurance company can no more refuse to sell a policy to a
> disabled person over the Internet than a furniture store can refuse to sell furniture
> to a disabled person who enters the store. The site of the sale is irrelevant to
> Congress's goal of granting the disabled equal access to sellers of goods and
> services. What matters is that the good or service be offered to the public.

268 F.3d 456, 459 (7th Cir. 2001) (internal citations omitted).

Based on these precedents, a district court in the First Circuit concluded that "public

accommodations" falling within the enumerated categories have an obligation to make their

websites accessible even if they do not have any physical locations:

> ADA covers the services 'of' a public accommodation, not services "at" or "in" a
> public accommodation. 42 U.S.C. § 12182(a). This distinction is crucial.
> Consequently, while the home is not itself a place of public accommodation,
> entities that provide services in the home may qualify as place of public
> accommodation. Under Defendant's reading of the statute, many businesses that
> provide services to a customer's home—such as plumbers, pizza delivery services,
> or moving companies—would be exempt from the ADA. The First Circuit held in
> *Carparts* that such an interpretation is absurd. Under the *Carparts* decision, *the*
> *Watch Instantly web site is a place of public accommodation and Defendant may*
> *not discriminate in the provision of the services of that public accommodation—*
> *streaming video—even if those services are accessed exclusively in the home.*

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 201-02 (D. Mass. 2012) (citations omitted) (emphasis added).

### 3) Second Circuit Precedent

The leading case in the Court of Appeals for the Second Circuit on this issue, *Pallozzi v. Allstate Life Insurance Co.*, 198 F.3d 28 (2d Cir. 1999), *opinion amended on denial of reh'g*, 204 F.3d 392 (2d Cir. 2000). It indicates that the court shares the view of the First and Seventh Circuits. In *Pallozzi*, a couple alleged that their application for a joint life insurance policy had been denied by Allstate because of their mental disabilities.

The question on appeal was whether Title III of the ADA "regulate[s] insurance underwriting practices." *Pallozzi*, 198 F.3d at 31. The court started with the text of Title III, noting that the statute named an "insurance office" as a "public accommodation" and that "[s]ection 302(a) bars a 'place of public accommodation' from 'discriminat[ing] against [an individual] on the basis of disability in the full and equal enjoyment of [its] *goods* [and] *services*.'" *Id.* (quoting 42 U.S.C. §§ 12181(7)(F), 12182(a)) (alterations and emphases in original). Rather than taking a literal approach to the term "insurance office," it sensibly held that the

> most conspicuous "goods" and "services" provided by an "insurance office" are insurance policies. Thus, the prohibition imposed on a place of public accommodation from discriminating against a disabled customer in the enjoyment of its goods and services appears to prohibit an insurance office from discriminatorily refusing to offer its policies to disabled persons. . . .

*Id.* (citing *Doe v. Mutual Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999)).

Allstate argued that the ADA was only concerned with physical access because Congress defined "the term 'public accommodation' to include 'insurance *office[s]*,' not insurance *companies*," and that "because insurance policies are not actually used *in* places of public

accommodation, they do not qualify as goods and services '*of* [a] place of public accommodation." *Id.* at 32 (quoting 42 U.S.C. § 12181(7)(F) and 42 U.S.C. § 12182(a)) (emphases in original). The court rejected this argument as

> unpersuasive. Title III's mandate that the disabled be accorded "full and equal enjoyment of the goods, [and] services . . . of any place of public accommodation," [42 U.S.C. § 12182(a)], suggests to us that *the statute was meant to guarantee them more than mere physical access.*

*Id.* at 32 (emphasis added). It then cited to a quotation from *Carparts*:

> To . . . *limit the application of Title III to physical structures* . . . *would severely frustrate* Congress's *intent* that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.

*Id.* (quoting *Carparts*, 37 F.3d at 20) (emphasis added).

The Second Circuit Court of Appeals emphasized *that it is the sale of goods and services to the public, rather than how and where that sale is executed, that is crucial* when determining if the protections of the ADA are applicable:

> We find no merit in Allstate's contention that, because insurance policies are not used in places of public accommodation, they do not qualify as goods or services "of a place of public accommodation." The term "of" generally does not mean "in," and there is no indication that Congress intended to employ the term in such an unorthodox manner in Section 302(a) of Title III. Furthermore, many of the private entities that Title III defines as "public accommodations"—such as a "bakery, grocery store, clothing store, hardware store, [or] shopping center," 42 U.S.C. § 12181(7)(E), as well as a "travel service, ... gas station, office of an accountant or lawyer, [or] pharmacy," id. § 12181(7)(F)—sell goods and services that are ordinarily used outside the premises. On Allstate's interpretation, a bakery's refusal to sell bread to a blind person would fall outside the scope of the statute. We see no basis for reading the statute so narrowly.

*Id.* at 33.

The court "base[d] its holding on the statutory text," without resort to the "ADA's legislative history and the interpretive guidelines issued by the Department of Justice." *Id.* Its

final conclusion was that Title III "unambiguously covers insurance underwriting in at least some circumstances." *Id.*

*Allstate* did not reach the precise question at issue in the present case. The court declined to address Allstate's argument that the "ADA does not reach underwriting" because the ADA prohibits discrimination by "insurance offices," and "underwriting decisions are made by company management, rather than by insurance offices, which are simply the places where people go to purchase insurance" because the issue was "not properly part of the appeal before" it. *Pallozzi*, 204 F.3d at 393. In *Allstate*, the Court of Appeals took a figurative, rather than literal, approach to the term "insurance office," observing that the "most conspicuous 'goods' and 'services' provided by an 'insurance office' are insurance policies," *Pallozzi*, 198 F.3d at 31, thus implicitly rejecting the argument it declined to reach on Allstate's motion for a rehearing.

The *Allstate* court also cited *Carparts* and *Doe* favorably—two cases that counsel against narrow readings of what a "place of public accommodation" is and what constitutes a "good" or "service" "of" such a place. *Carparts*, 37 F.3d at 19-20; *Doe*, 179 F.3d at 559. These cases looked to the purpose of the ADA and decided that a crabbed reading of its language did not comport with the ADA's remedial goal.

The Court of Appeals for the Second Circuit itself characterized its holding in *Pallozzi* as being "that an insurance office in its dealings with the public is a 'place of public accommodation' and is regulated by Title III." *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 n. 8 (2d Cir. 1999).

The issue being contested now—the importance of a link between a "place" and the goods and services being offered by the company—was given virtually no import by the court.

Neither the decision by the appellate court nor the district court decision it overturned specified *where* any of the conduct giving rise to the lawsuit took place, including if the plaintiffs went to an insurance office, if they called an insurance office from their homes, if the persons they spoke to at Allstate worked out of an office open to the public, or if the persons at Allstate who made the decision to refuse to sell them another policy were working out of an insurance office open to the public. Without elaboration, the court simply stated that "[t]here is no dispute that Plaintiffs in this case have" "a nexus to a place of public accommodation." *Pallozzi*, 198 F.3d at 33 n. 3.

This district court, as it must, adopts the Second Circuit's sensible approach to the ADA. It is unambiguous that under Title III of the ADA, dickblick.com is a place of public accommodation. Blick is prohibited from discriminating against the blind by failing to take the steps necessary to ensure that the blind have "full and equal enjoyment" of the goods, services, privileges, advantages, facilities, or accommodations of its website—provided that taking such steps would not impose an undue burden on Blick or fundamentally alter the website.

This decision is consistent with the opinions of the other district courts in this circuit which have analyzed this question. *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, (D. Vt. 2015) (Title III of the ADA covers the website of a company without any physical locations); *Markett v. Five Guys Enterprises LLC*, 1:17-cv-00788-KBF, ECF No. 33, Order on Def.'s Mot. to Dismiss (S.D.N.Y. July 21, 2017), at 4 ("[T]he text and purposes of the ADA, as well as the breadth of federal appellate decisions, suggest that defendant's website is covered under the ADA, either as its own place of public accommodation or as a result of its close relationship as a service of defendant's restaurants, which indisputably are public accommodation under the statute.").

### 4) The ADA's Text and Structure

The text and structure of the statute compel the *Scribd* interpretation. The title of Title III is "Public Accommodations and Services Operated by Private Entities," not "*Places* of Public Accommodation and Services Operated by Private Entities." 42 U.S.C. subch. III. The title of the section prohibiting discrimination is "Prohibition of Discrimination by Public Accommodations," not "Prohibition of Discrimination by or in *Places* of Public Accommodation." 42 U.S.C. § 12182. The categories of private entities covered by the subchapter are listed under the heading "Public accommodation," not "*Places* of public accommodation." 42 U.S.C. § 12181(7).

When describing the public accommodations covered by the law, the statute uses a variety of different words, including "place," "office," and "establishment." *Id.* When describing the entities that sell goods and provide services to the public, the word "place" is never used, and the statute makes evident that it covers every "sales or rental establishment" and "service establishment." 42 U.S.C. § 12181(7)(E)-(F).

While the statute defines "public accommodation," it never defines the terms "place" or "place of public accommodation." These choices indicate that the word "place" was not intended to limit the statute's reach, but "that Congress likely used the word 'place' because there was no other less cumbersome way to describe businesses that offer those particular goods or services to the public." *Scribd*, 97 F. Supp. 3d at 572.

The use of the word "facilities" throughout the statute bolsters this interpretation. A separate section within Title III, section 12183, "New construction and alterations in public accommodations and commercial facilities," provides:

(a) Application of term

Except as provided in subsection (b) of this section as applied to public accommodations and commercial facilities, discrimination for purposes of section 12182(a) of this title includes—

>(1) a failure to *design and construct facilities for first occupancy* later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is *structurally impracticable* to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter; and
>
>(2) *with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment* in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, *the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.* Where the entity is undertaking an alteration that affects or could affect *usability of or access to an area of the facility* containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the *path of travel to the altered area* and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations to the path of travel or the bathrooms, telephones, and drinking fountains serving the altered area are not disproportionate to the overall alterations in terms of cost and scope (as determined under criteria established by the Attorney General).

(b) Elevator

>Subsection (a) of this section shall not be construed to require the installation of an elevator for *facilities that are less than three stories or have less than 3,000 square feet per story unless the building* is a shopping center, a shopping mall, or the professional office of a health care provider or unless the Attorney General determines that a *particular category of such facilities requires the installation of elevators based on the usage of such facilities.*

42 U.S.C. § 12183 (emphases added). The emphasized words show that in these provisions, the term "facility" refers to a building or physical structure.

The term "facility" is also used in 42 U.S.C. § 12182(a). There is a presumption "that identical words used in different parts of the same act are intended to have the same meaning," though the "fundamental canon of statutory construction that the words of a statute must be read

in their context and with a view to their place in the overall statutory scheme" can overcome this presumption. *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2441 (2014) (internal quotation marks omitted). In the present case, both the "same meaning" presumption and context indicate that the term "facility" refers to a building or physical structure in § 12182(a) as well.

Section 12183 specifies that "discrimination for purposes of section 12182(a) of this title *includes*" not making the identified alterations to new and existing structures to render them physically accessible. 42 U.S.C. § 12183 (emphasis added). These specific rules about physical accessibility are not the only way for a public accommodation to discriminate—"[t]he word 'includes' is usually a term of enlargement, and not of limitation." *Burgess v. United States*, 553 U.S. 124, 131 n. 3 (2008) (alteration and internal quotation marks omitted). Section 12182(a) lists the denial of the "full and equal enjoyment" of "facilities" of a place of public accommodation as one of several ways a public accommodation could discriminate against the disabled; a place of public accommodation is also prohibited from denying a disabled person the "full and equal enjoyment" of its "the goods, services, [ ], privileges, advantages, or accommodations." 42 U.S.C. § 12182(a). The Act could have easily cabined the prohibition on discrimination to the goods, services, etc. of a "facility" of a "place of public accommodation," or used the word "facility" instead of "place," but it did not.

### 5) The ADA's Purpose

This broad interpretation is proper because it is harmonious with the purpose of the ADA. Congress stated as a matter of public policy that the "Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7). The purpose of the

ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* § 12101(b)(1); *see PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001) ("Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals."). The ADA is a "broad mandate" with the "sweeping purpose" of "eliminate[ing] discrimination against disabled individuals" and "integrat[ing] them into the economic and social mainstream of American life;" "one of the Act's most impressive strengths . . . [is] its comprehensive character." *PGA Tour*, 532 U.S. at 675 (internal quotation marks omitted).

"As a remedial statute, the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted).

Blick's suggested construction of Title III would contravene the ADA's broad remedial purpose. Its view would exempt a huge—and growing—swath of mainstream American life based on the Internet from the Act's requirements.

The "broad mandate" of the ADA and its "comprehensive character" are resilient enough to keep pace with the fact that the virtual reality of the Internet is almost as important now as physical reality alone was when the statute was signed into law. That the meteoric rise of virtual reality through the Internet and its impact on communal and commercial affairs could not have been anticipated by Congress does not mean the law's application to the Internet and website is ambiguous; "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (applying the ADA to state prisoners because of its

"unambiguous statutory text" while rejecting petitioners' argument that the ADA does not apply to state prisoners because Congress did not "envision that the ADA would be applied to state prisoners"); *see also Enyart v. National Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011) ("[A]ssistive technology is not frozen in time: as technology advances, . . . accommodations should advance as well.").

### 6) Avoidance of Absurd Results

Applying Blick's interpretation of Title III would violate the precept that a statute should be read to avoid "absurd" results. *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 368 (2d Cir. 2006). The defendant believes that the narrow interpretation of the court in *Gomez v. Bang & Olufsen Am., Inc.* is the correct one. *See* Def.'s Reply Mem. in Supp. of its Mot. to Dismiss, ECF No. 17, at 2-3. The *Gomez* court adopted the reasoning of the *Target* court and held that an ADA claim premised on the inaccessibility of a website can survive a motion to dismiss if the website's inaccessibility "impedes the plaintiff's access to a specific, physical, concrete space, and establishes some nexus between the website and the physical place of public accommodation." *Gomez*, 2017 WL 1957182 at *3 (internal quotation marks and alteration omitted). As the court limited its holding in *Target*:

> to the extent that plaintiffs allege that the inaccessibility of Target.com impedes the full and equal enjoyment of goods and services offered in Target stores, the plaintiffs state a claim, and the motion to dismiss is denied. To the extent that Target.com offers information and services unconnected to Target stores, which do not affect the enjoyment of goods and services offered in Target stores, the plaintiffs fail to state a claim under Title III of the ADA.

*Target*, 452 F. Supp. 2d. at 956.

Interpreting the statute in the *Target* way would require that only select aspects of Blick's website and online presence be accessible to the blind. For example, Blick would need to change its website to allow a blind person to find, successfully complete, and use the email list

that provides for in-store coupons, but would not need to do so for the email list that only provides online discounts. Blick would have to make accessible information about products available for in-store pickup, but would not have to do so for items available only online, though presumably which item a category falls into could depend on the store selected for pick-up and the inventory it has on hand. Putting aside whether such a design for a website is even feasible, the unworkability of it seems plain.

The litigation in the *Target* case demonstrates the difficulties with Blick's position. When the plaintiffs in *Target* initially moved for class certification, the court delayed in granting certification because of concerns about whether or not the putative class members would be able to state a cognizable injury; their declarations "ma[de] clear that these are individuals who would prefer to shop online . . . However, stating that class members would prefer to shop online is not sufficient to establish a nexus with the stores for the purposes of the ADA." *Nat'l Fed'n of the Blind v. Target Corp.*, 2007 WL 1223755, at *4 (N.D. Cal. Apr. 25, 2007). The plaintiffs then filed supplemental declarations. These declarations "satisfied" the court that the putative class members "were denied access to the enjoyment of goods and services offered in Target stores as a result of their inability to access Target.com. The declarations present[ed] two types of alleged access problems: diverted purchases and in-store barriers." *Nat'l Fed'n of the Blind v. Target Corp.*, 582 F. Supp. 3d 1185, 1194 (N.D. Cal. 2007).

The "diverted purchases" claim in *Target* was based on class members being "deterred from going to Target stores after their experiences with the website." *Id.* The court held that "those declarants who have described specific incidents in which they were diverted to another store by virtue of the inaccessibility of Target.com have met the class definition." The second set of claims was premised on "the increased time and expense incurred during in-store shopping

as a result of the inaccessibility of the website. Their inability to pre-shop on the website required declarants to hire an aide or ask a friend or family member to accompany them." *Id.* The court rejected Target's argument that "these shoppers merely experienced inconvenience," holding that "the increased cost and time to surmount the alleged barriers presented by the inability to pre-shop demonstrate that these declarants have met the class definition." *Id.* at 1195. The court certified the class based on these claims, but not before dismissing one plaintiff who managed to buy towels at a physical Target store "after hiring a driver and coordinating a trip with a companion" because "his declaration [did] not suggest" that the "increased expense and time" involved with "hiring the driver and arranging for the companion were necessary *only* because he could not pre-shop." *Id.* at 1204 (emphasis added).

The *Target* litigation lays bare the unworkability of the requirement that a website is only subject to the ADA if its use involves a connection to a physical store. Disabled individuals have a right to "pre-shop" in their home, but no right to actually make a purchase in their home. Disabled individuals have no right whatsoever to purchase goods or services from companies whose business models (*e.g.* television shopping channels, catalogs, online-only) are premised on having customers shop only from home.

While these theories of liability might conceivably be workable for a retail giant like Target, which has hundreds of stores nationwide, how would they apply to other public accommodations? Could a company that only sells goods online become subject to the ADA's regulatory regime overnight if it decides to open a physical shop or showroom? What if that business only opens a single location? Does the business's website only need to be accessible to individuals who live close enough to the one store so that it is possible they may shop there one day? What if the company shutters the store—is it free to begin discriminating anew on its

website?  A rigid adherence to a physical nexus requirement leaves potholes of discrimination in what would otherwise be a smooth road to integration.  It would be perverse to give such an interpretation to a statute intended to comprehensively remedy discrimination.

### 7)  Plaintiff States a Claim Under the ADA

Congress passed the ADA because it found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).  Within a few years of its enactment, the law improved the lives of millions of Americans by making public accommodations more accessible to and society more accepting of those with disabilities.  *See* United States Commission on Civil Rights, *Sharing the Dream: Is the ADA Accommodation All?*, published in October 2000 following a two-day hearing conducted by the Commission in November 1998, *available at* http://www.usccr.gov/pubs/ada/main.htm (last visited July 27, 2017) ("Individuals with disabilities believe the ADA has made a great difference in their lives.  The ADA has increased the level of participation in mainstream American society, including better access to buildings, greater access to transportation, and fuller inclusion in the community.").

Today, internet technology enables individuals to participate actively in their community and engage in commerce from the comfort and convenience of their home.  It would be a cruel irony to adopt the interpretation of the ADA espoused by Blick, which would render the legislation intended to emancipate the disabled from the bonds of isolation and segregation obsolete when its objective is increasingly within reach.

Plaintiff has stated a claim under the ADA.  Defendant's 12(b)(6) motion on this claim is denied.

## B. New York State Human Rights Law and New York State Civil Rights Law

The New York State Human Rights Law ("NYSHRL") is comprised of the New York

Executive Law § 292 *et seq.* (which provides the substance of the law) and the New York Civil

Rights Law § 40 *et seq.* (which provides for penalties). *See de la Rosa v. 597 Broadway*

*Development Corp.*, 2015 WL 7351540, at *17, n. 16 (S.D.N.Y. Aug. 4, 2015) (using the

"collective term NYSHRL" to refer to the statutes); *Ganzy v. Allen Christian Sch.*, 995 F. Supp.

340, 350 (E.D.N.Y. 1998) ("Facts sufficient to sustain a cause of action under New York

Executive Law section 296 will support a cause of action under section 40-c of the Civil Rights

Law."). In general, disability discrimination claims under the NYSHRL rise or fall in tandem

with disability discrimination claims brought pursuant to the federal ADA. *Graves v. Finch*

*Pruyn & Co., Inc.*, 457 F.3d 181, 186 n. 3 (2d Cir. 2006). The NYSHRL reads:

> It shall be an unlawful discriminatory practice for any person, being the owner,
> lessee, proprietor, manager, superintendent, agent or employee of any place of
> public accommodation, resort or amusement, because of the . . . disability . . . of
> any person, directly or indirectly, to refuse, withhold from or deny to such person
> any of the accommodations, advantages, facilities or privileges thereof[.]

N.Y. Exec. Law § 296(2)(a).

The law defines the term "place of public accommodation, resort or amusement" as

including "wholesale and retail stores and establishments dealing with goods or services of any

kind." N.Y. Exec. Law § 292(9). A "discriminatory practice" includes

> a refusal to make reasonable modifications in policies, practices, or procedures,
> when such modifications are necessary to afford facilities, privileges, advantages
> or accommodations to individuals with disabilities, unless such person can
> demonstrate that making such modifications would fundamentally alter the nature
> of such facilities, privileges, advantages or accommodations[, or] a refusal to take
> such steps as may be necessary to ensure that *no individual with a disability is*
> *excluded or denied services because of the absence of auxiliary aids and services,*
> *unless such person can demonstrate that taking such steps would fundamentally*
> *alter the nature of the facility, privilege, advantage or accommodation being*
> *offered or would result in an undue burden.*

N.Y. Exec. Law § 296(2)(c)(i)-(ii) (emphasis added). "Auxiliary aids and services" include "qualified readers, taped texts or other effective methods of making visually delivered materials available to individuals with visual impairments; acquisition or modification of equipment or devices; and others similar devices and actions." N.Y. Exec. Law § 296(2)(d)(ii)(B)-(D).

Whether a website itself is a "place of public accommodation" or an "accommodation, advantage, facility or privilege" of a retail store appears to be an issue of first impression under the NYSHRL. New York case law counsels a broad and expansive interpretation of these terms. "[T]he provisions of the Human Rights Law must be liberally construed to accomplish the purposes of the statute." *Cahill v. Rosa*, 674 N.E.2d 274, 276 (N.Y. 1996).

Over time, the New York State Legislature has "repeatedly amended the statute to expand its scope," specifying that the list of places of public accommodation "is illustrative, not specific." *Id.*

> This history provides a clear indication that the Legislature used the phrase place of public accommodation in the broad sense of providing conveniences and services to the public and that it intended that the definition of place of accommodation should be interpreted liberally.

*Id.* (internal quotation marks omitted).

"The statutory language [underlying the term 'place of public accommodation'] states two concepts, [1] the idea of public accommodation *in the broad sense of providing conveniences and services to the public*, and [2] the idea of *place*." *United States Power Squadrons v. State Human Rights Appeal Bd.*, 452 N.E.2d 1199, 1203 (N.Y. 1983) (emphasis added).

Only the second concept, *place*, is disputed. In *United States Power Squadrons*, the New York Court of Appeals took an expansive view of what a "place" may be. The Court adopted the

definition of "place" given by a New Jersey appellate court in *National Organization for Women, Essex County Chapter v. Little League Baseball, Inc. Id.* In that case, the New Jersey court rejected Little League's argument that it is not a "place of public accommodation" because "it is a membership organization which does not operate from any fixed parcel of real estate," noting that "[t]he statutory noun 'place' (of public accommodation) is a term of convenience, not of limitation[, that] . . . is employed to reflect the fact that public accommodation are commonly provided at fixed 'places.'" *Little League Baseball*, 318 A.2d 33, 37 (N.J. App. Div. 1974). The *Little League* court continued:

> But a public conveyance, like a train, is a 'place' of public accommodation although it has a moving situs. The 'place' of public accommodation in the case of Little League is obviously the ball field at which tryouts are arranged, instructions given, practices held and games played. The statutory 'accommodations, advantages, facilities and privileges' at *the place of public accommodation is the entire agglomeration of the arrangements which Little League and its local chartered leagues make and the facilities they provide* for the playing of baseball by the children.

*Id.* (internal citations omitted) (emphasis added).

The Court of Appeals of New York used the same language as the *Little League* court, agreeing that the term "*place*" in the New York statute was a "*term of convenience, not limitation.*" *Id.* (emphasis added). The New York court further noted that the statute listed

> places of accommodations which have no fixed place of operation but supply their services at a variety of locations[, and that] [t]he statute also applies to "establishments dealing with goods or services of any kind." *Analytically, such establishments may discriminate by denying goods and services without denying individuals access to any particular place, e.g., home delivery service or services performed in the customer's home and mail order services.*

*Id.* at 1204 (emphasis added).

New York's broad reading of the term "place" and the presumption that the NYSHRL should be interpreted consistently with the ADA suggests a finding that dickblick.com is a "place

of public accommodation" under the NYSHRL. Through plaintiff's assertion that he is unable to

use the website due to his disability, he has stated a claim that Blick has violated the NYSHRL.

The defendant's 12(b)(6) motion on this claim is denied.

### C.  New York City Human Rights Law

The New York City Human Rights Law ("NYCHRL") is embodied in section 8-107 of

the New York City Administrative Code.  The law makes it

> an unlawful discriminatory practice for any person who is the owner, franchisor,
> franchisee, lessor, lessee, proprietor, manager, superintendent, agent, or employee
> of any place or provider of public accommodation [b]ecause of any person's actual
> or perceived . . . disability . . . directly or indirectly [t]o refuse, withhold from or
> deny to such person the full and equal enjoyment, on equal terms and conditions,
> of any of the accommodations, advantages, services, facilities or privileges of the
> place or provider of public accommodation.

N.Y.C. Admin. Code § 8-107(4)(a).  It requires that "any person prohibited by the [law] from

discriminating on the basis of disability shall make reasonable accommodation to enable a

person with a disability to . . . enjoy the right or rights in question provided that the disability is

known or should have been known by the covered entity."  *Id.* § 8–107(15)(a).

Though it uses similar language to the ADA and the NYSHRL, the NYCHRL must be

given "*an independent liberal construction analysis in all circumstances*, even where state and

federal civil rights laws have comparable language."  *Williams v. N.Y.C. Hous. Auth.*, 872

N.Y.S.2d 27, 31 (N.Y. App. Div. 2009) (emphasis added).

"There is now a one-way ratchet: 'Interpretations of New York state or federal statutes

with similar wording may be used to aid in interpretation of New York City Human Rights Law,

viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which

the City's Human Rights law cannot fall.'"  *Loeffler v. Staten Island University Hosp.*, 582 F.3d

268, 278 (2d Cir. 2009) (emphasis in original) (quoting The Local Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005)).

Unlike the ADA and NYSHRL, the NYCHRL covers discrimination that in the provision of "accommodations, advantages, services, facilities or privileges of the place *or provider* of public accommodation." N.Y.C. Admin. Code § 8-107(4)(a) (emphasis added). The use of the word "provider" clearly covers Blick's website—even if one could quibble with whether the website is a "place," it undoubtedly "provides" to the public "accommodations, advantages, services, facilities or privileges." Given the court's ruling that the plaintiff has stated a claim under the ADA and the NYSHRL—the "floor" of protection provided by the NYCHRL—he has also stated a claim under the NYCHRL. The defendant's 12(b)(6) motion on this claim is denied.

## V. Defendant's Remaining Arguments

Blick makes two additional arguments for why a motion to dismiss should be granted. First, it contends that the case should be dismissed pursuant to the primary jurisdiction doctrine, counseling that the need for uniformity in administering the ADA and the expertise of the Department of Justice ("DOJ") make this case inappropriate for judicial resolution. Second, Blick argues that the remedy requested by the plaintiff—an injunction requiring that dickblick.com make its website accessible and usable by blind individuals—would violate defendant's due process rights because the ADA and its regulations do not provide website accessibility guidelines.

### A. Primary Jurisdiction Doctrine

"Primary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues,

usually of a factual nature, which are placed within the special competence of the administrative body." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58-59 (2d Cir. 1994). It is a "prudential" doctrine that "applies to matters outside the conventional experiences of judges or those that fall within the realm of administrative discretion to administrative agencies with more specialized experience, expertise, and insight." *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 74 (E.D.N.Y. 2015) (internal quotation marks and alteration omitted).

"The threshold issue in determining whether this doctrine applies is whether both the court and an agency have jurisdiction over the same issue." *Golden Hill*, 39 F.3d at 59. The Court of Appeals for the Second Circuit has identified four relevant factors for determining whether this discretionary doctrine should be applied:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
> (2) whether the question at issue is particularly within the agency's discretion;
> (3) whether there exists a substantial danger of inconsistent rulings; and
> (4) whether a prior application to the agency has been made.

*Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006). "[T]he advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings" must be considered. *Id.* at 83 (citation omitted). The doctrine only applies in a "relatively narrow" set of circumstances. *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988) (citation omitted) ("applied only when a lawsuit raises an issue, frequently the validity of a commercial rate or practice, committed by Congress in the first instance to an agency's determination, particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency"). Where the issue is "legal in nature and lies within the traditional realm of judicial competence," courts have generally not applied the doctrine. *Id.*

Analyzing the text of the ADA and its regulations and deciding whether a business is in compliance with those laws is a task well within the competence of the judicial branch. *See, e.g.*, *Camarillo*, 518 F.3d at 156 (analyzing whether the plaintiff, a blind individual, was discriminated against by not being afforded a "'full and equal' opportunity to enjoy the services at defendants' restaurants because the restaurants provided neither a large print menu that she could read, nor any other means to ensure 'effective communication' of their menu options."); *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 295 (2d Cir. 2006) (declining to apply the primary jurisdiction doctrine when the "question in the present case . . . does not involve technical or policy considerations within the agency's particular field of expertise but instead simply requires us to engage in an activity—statutory interpretation—that is the daily fare of federal judges."); *see generally*, *T.K. v. New York City Dept. of Educ.*, 779 F. Supp. 2d 289 (E.D.N.Y. 2011) (analyzing how the advent of the Internet impacts statutory rights and obligations under the Individuals with Disability Education Act).

Though there is some risk of inconsistent rulings, the problem is mitigated by a factor that weighs against application of the doctrine: the plaintiff's right to a prompt adjudication of his claim. *See Goya Foods, Inc.*, 846 F.2d at 853 (declining to apply the primary jurisdiction doctrine because the benefits of awaiting a decision from the agency was "outweighed by the litigants' need for a prompt adjudication."); *Golden Hill*, 39 F.3d at 60 ("There clearly is a public interest in reasonably prompt adjudication.").

Despite being queried by members of Congress nearly two decades ago on the issue of whether website accessibility falls under the ADA, *see* Letter from Deval L. Patrick, Assistant Att'y Gen., to Senator Tom Harkin (Sept. 9, 1996), the DOJ has still not promulgated rules related to this specific issue. The DOJ, the agency tasked with promulgating regulations

implementing the ADA, *see* 42 U.S.C. § 12186(b), issued an Advance Notice of Proposed

Rulemaking ("ANPRM") seven years ago stating that it was "considering revising the

regulations implementing title III of the [ADA] in order to establish requirements for making the

goods, services, facilities, privileges, accommodations, or advantages offered by public

accommodations via the Internet, specifically at sites on the World Wide Web (Web), accessible

to individuals with disabilities." Nondiscrimination on the Basis of Disability; Accessibility of

Web Information and Services of State and Local Government Entities and Public

Accommodations, 75 Fed. Reg. 43460–01, 43460, 2010 WL 2888003 (July 26, 2010). No rule

or regulation emerged from the ANPRM. Prompted by changes to "the Internet, accessibility

tools, and assistive technologies," on April 29, 2016, the DOJ withdrew the ANPRM and issued

a Supplemental Advance Notice of Proposed Rulemaking ("SANPRM"). Department of Justice,

*Statement Regarding Rulemaking on Accessibility of Web Information and Services of State and*

*Local Government Entities* (Apr. 29, 2016), *available at*

https://www.ada.gov/regs2016/sanprm_statement.html (last visited on June 23, 2017). The

SANPRM only sought input on accessibility guidelines related to the websites of entities covered

by Title II of the ADA. Development of website accessibility rules for entities covered by Title

III is proceeding on a separate track. *See id.* ("The Department received approximately 400

public comments addressing issues germane to both titles II and III in response to the 2010

ANPRM. Upon review of those comments, the Department announced in 2015 that it decided to

pursue separate rulemakings addressing Web accessibility for titles II and III. The Department is

moving forward with rulemaking under title II first."). It is unknown when a similar notice

related to regulations concerning Title III entities will be issued.

The court is sympathetic to defendant's argument that resolution of this case will involve delving into technical material that is better suited for an agency determination. To address the court's current lack of knowledge about website design and the assistive technologies used by the blind, the court will hold a "Science Day" featuring testimony from expert witnesses. *See infra* Part VI.

In the court's experience, agencies are sometimes unwilling to act on a judicial recommendation that they take charge of an issue of national import that is squarely within their jurisdiction. *See Kurtz v. Kimberly-Clark Corporation*, 2016 WL 6820405, at *2 (after invoking the primary jurisdiction doctrine and staying several cases to allow the Federal Trade Commission to weigh in on the meaning of the word "flushable" in consumer advertisements, the court's suggestion of an "aggregate administrative approach was rejected by the Federal Trade Commission.").

The plaintiff has made a prima facie case that Blick is violating his rights under the ADA. The court will not delay in adjudicating his claim on the off-chance the DOJ promptly issues regulations it has contemplated issuing for seven years but has yet to make significant progress on.

The interpretation of statutes and regulations is a task suited to the judiciary. It is unlikely that the DOJ will resolve this issue in a timely manner. The court declines to apply the primary jurisdiction doctrine.

### B. Due Process

Defendant argues that a finding that a public accommodation's website must be made accessible to the blind would violate the defendant's right to due process because the DOJ has not issued regulations or guidance specifying how a public accommodation must make its

website accessible to the blind, which the DOJ has done with other facets of the ADA's accessibility mandate. *See, e.g.*, 36 C.F.R. Pt. 1191, App. B (detailing "scoping and technical requirements for accessibility to sites, facilities, buildings, and elements by individuals with disabilities"). In particular, the defendant is concerned with the plaintiff's request that the defendant's website conform to technical standards published by a particular nongovernmental entity, noting that such standards can change "at any time" and that consent decrees entered into by the DOJ have required businesses to comply with differing technical standards. *See* Def.'s Mem. in Supp. of its Mot. to Dismiss, ECF No. 11-1, at 9-10; Def.'s Reply Mem. in Supp. of its Mot. to Dismiss, ECF No. 17, at 5-7. The only case supporting this argument appears to be a non-binding decision from a federal district court in California. Def.'s Mem. in Supp. of its Mot. to Dismiss, ECF No. 11-1, at 9-10 (citing *Robles v. Dominos Pizza LLC*, 2017 U.S. Dist. LEXIS 53133 (C.D. Cal. Mar. 20 2017); Def.'s Reply Mem. in Supp. of its Mot. to Dismiss, ECF No. 17, at 5-7 (same).

The defendant's principal complaint appears to be that it wants there to be black-and-white rules for ADA compliance, and here, there may be shades of gray. But the anti-discrimination provisions the defendant is accused of violating are not simple checklists of clear-cut rules—they are standards that are meant to be applied contextually and flexibly. The "gray" the defendant complains of is a feature of the Act.

The ADA requires public accommodations to provide "reasonable modifications" or "auxiliary aids or services" to disabled individuals to ensure them the "full and equal enjoyment" of the goods, services, and accommodations places of public accommodation provide; public accommodations do not discriminate if the modifications needed are unreasonable or would "fundamentally alter the nature" of the good, service, or accommodation; they also do not

discriminate if the provision of auxiliary aids or services would be "unduly burdensome" or if the provision of auxiliary aids or services would fundamentally alter the nature of the good, service, or accommodation. 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii). Blick does not point to any word or term that is unconstitutionally vague. A statute's use of the word "reasonable" and similar terms is not constitutionally problematic. *Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843, 855-56 (2d Cir. 1984) (rejecting a challenge to a statute as unconstitutionally vague because it provided for the use of "reasonable" actuarial assumptions); *Pinnock v. International House of Pancakes Franchisee*, 844 F. Supp. 574, 582 (S.D. Cal. 1993) ("The terms 'reasonable modifications' and 'fundamental alteration' are [] not unconstitutionally vague.")

What is "reasonable" or too burdensome or a fundamental alteration will vary depending on a plaintiff's disability and a defendant's goods, services, accommodations, and resources—a modification that works for a certain plaintiff may not work for all plaintiffs and may not be a reasonable request to make of every defendant. *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) ("[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it.").

The operative terms of the statute encourage flexibility and cooperation between the parties to meet the law's goals. *See, e.g., Camarillo*, 518 F.3d at 157 ("While restaurants are not necessarily required to have on hand large print menus that [plaintiff] would be able to read, they are required to ensure that their menu options are effectively communicated to individuals who . . . are legally blind."); *Jackan v. New York State Dept. of Labor*, 205 F.3d 562, 566 (2d Cir.

2000) ("The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.").

An inquiry about whether a certain modification or accommodation is overly burdensome or is a fundamental alteration is necessarily fact-specific and is an affirmative defense to a prima facie claim of disability discrimination. *See, e.g., Brooklyn Center for Independence of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 657 (S.D.N.Y. 2013) ("The contention that a requested accommodation constitutes a fundamental alteration or would impose an undue hardship is an affirmative defense."). Defendant's concerns about potential modifications and remedies are not ripe for resolution at this stage of the litigation. Defendant's motion to dismiss on due process ground is rejected.

## VI.     Conclusion

Defendant's preliminary motion to dismiss for lack of substantive jurisdiction is denied. The Americans with Disabilities Act applies to plaintiff's claim.

## VII.    Directions for Further Action in the Litigation

1.      Discovery shall be expedited.

2.      The parties shall make any summary judgment motions returnable October 18, 2017. Briefing schedules shall be arranged by counsel, with the help of the magistrate judge if necessary.

3.      A "Science Day" will be held on October 18 and 19, 2017. Experts and demonstrations shall indicate what methods can be used to satisfy plaintiffs' needs, their costs, advantages and disadvantages, and other relevant considerations, such as workable, flexible definitions.

4.     The court is not at present contemplating class certification for the reasons stated orally on the record, but it will hear argument on this issue on "Science Day."


SO ORDERED.


Jack B. Weinstein
Senior United States District Judge

Date:   July 31, 2017
        Brooklyn, New York