UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTOR ANDREWS, on behalf of himself and all others similarly situated, | MEMORANDUM and ORDER |
| | 17-CV-767 |
| Plaintiff, | |
| – against – | |
| BLICK ART MATERIALS, LLC, | |
| Defendant. | |

**Parties**                                              **Appearances**

**Victor Andrews**                                       **C.K. Lee**
                                                         **Anne Seelig**
                                                         Lee Litigation Group, PLLC
                                                         30 East 39th Street
                                                         2nd floor
                                                         New York, NY 10016
                                                         212-465-1188
                                                         Fax: 212-465-1181
                                                         cklee@leelitigation.com

**Blick Art Materials, LLC**                             **David Seth Korzenik**
                                                         **Terence Patrick Keegan**
                                                         Miller Korzenik Sommers LLP
                                                         488 Madison Avenue, Suite 1120
                                                         New York, NY 10022
                                                         212-752-9200
                                                         Fax: 212-688-3996
                                                         dkorzenik@mkslex.com

                                                         **Steve Baron**
                                                         **Steven Mandell**
                                                         Mandell Menkes LLC
                                                         1 North Franklin Street, Suite 3600
                                                         Chicago, IL 60606
                                                         312-251-1006
                                                         Fax: 312-759-2159
                                                         sbaron@mandellmenkes.com

**JACK B. WEINSTEIN, Senior United States District Judge:**

**Contents**

I.    Introduction ........................................................................................................ 3

II.    Settlement ......................................................................................................... 5

III.    Law ................................................................................................................... 7

    A.    American's with Disabilities Act ......................................................... 7

    B.    Quasi-Class Action ............................................................................... 8

    C.    Settlement Standard of Review .......................................................... 11

    D.    Sealing Attorneys' Fees ...................................................................... 12

IV.    Hearing and Submissions ................................................................................ 13

    A.    Visually Impaired Users' Access to the Internet ............................... 14

        1.    Screen Reading Software ............................................................ 14

        2.    Visually Impaired Users' Access to Properly Functioning Websites .............. 15

        3.    Blick's Website ........................................................................... 18

        4.    Access to Training and Resources .............................................. 23

    B.    WCAG 2.0 Level AA Guidelines ....................................................... 25

    C.    Implementation and Timeline of Guidelines to Blick's Website ....... 28

    D.    Class and Quasi-Class Action Issues ................................................. 30

V.    Application of Law to Facts ............................................................................. 31

A.    Elimination of Class Allegations.........................................................................31

B.    Reasonableness of Settlement Terms..................................................................32

C.    Sealing of Attorneys' Fees and Fee Approval ...................................................34

VI.    Conclusion ...................................................................................................................35

App. A: Declaration of Victor Andrews.…………………………………………………..37

App. B: Declaration of Mark Riccobono.…..……………………………………………..…39

App. C: Declaration of Aaron Cannon.………………………………………………..…62

## I.    Introduction

Equal opportunity for the disadvantaged—so far as practicable—has been a major goal of

the United States since World War II.  This case deals with one aspect of that struggle—

providing the visually impaired with an effective opportunity to use the internet for procuring

consumer products.  *See Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL

3278898, -- F.Supp.3d -- (E.D.N.Y. Aug. 1, 2017) ("*Andrews I*").

There has been a cascade of litigation over the past several years, with at least 750

lawsuits, concerning access to the internet by visually impaired individuals.  Vivian Wang,

*College Websites Must Accommodate Disabled Students, Lawsuits Say*, N.Y. Times, Oct. 11,

2017 at A20.  Sitting at the intersection of technology and disability, these cases, including the

present litigation, cry out for speedy, just resolutions.  The blind, like the deaf, can,

demonstrations during the present litigation have shown, achieve high internet communication

skills if they are trained and have appropriate cooperation from merchants in providing the

proper technology and software.  *See, e.g.*, Oliver Sacks, *Seeing Voices* xiii (First Vintage Books

Ed. 2000) ("[T]he almost unlimited plasticity and resources of the nervous system, the human

3

organism, when it is faced with the new and must adapt . . . the infinite resources for survival and transcendence which Nature and Culture, together, have given us.").  This memorandum and order, approving the parties' settlement, provides an example of a reasonable resolution of the issues, providing significant expansion of internet access to the visually impaired.

This putative class action was brought by a blind person, Victor Andrews, against Blick Art Materials ("Blick"), a major national vendor of art materials in stores and over the internet. Andrews, who holds a college degree in Radio and Broadcasting Technology, claims that Blick could adjust its website's code so that visually impaired individuals could more readily purchase art materials on its primary website, dickblick.com.

In a prior opinion, the court ruled that the Americans with Disabilities Act ("ADA"), New York State Human Rights Law, New York State Civil Rights Law, and New York City Human Rights Law apply to Blick's electronic merchandising. *See Andrews I*.  Scientific demonstrations in court, testimony, and argument demonstrated that there are well-established, developing guidelines for making websites accessible to visually impaired people. Dickblick.com does not follow these guidelines, so defendant's website is largely inaccessible to those who are visually impaired.  The plaintiff was denied, a jury could find, equal access to Blick's stores, as well as to the numerous goods, services, and benefits offered to the public through dickblick.com.

The plaintiff moves to withdraw the class action allegations.  Both parties seek approval of a settlement agreed to by them.  Embedded within the scope of review raised by the parties' settlement are two questions:  first, was it appropriate for the plaintiff to have abandoned the class action aspect of the case for individual relief that will necessarily inure to the benefit of the

putative class members; and second, are the terms of the settlement substantively reasonable, equitable, and fair.

The court reviews the settlement in this case using its inherent power. *Cf.* Stephen Bergstein, *Second Circuit to Decide Whether District Courts Must Approve 'Cheeks' Settlements Under Rule 68*, N.Y L.J., Dec. 13, 2017 at 4 (discussing cases where district courts must approval settlements because of the wide-ranging effects on individuals). Although there has been no motion for class certification, this case can be properly characterized as a quasi-class action. In other quasi-class actions, courts have used their inherent power to review the reasonableness of settlements. *See Infra* Part III(B)-(C).

Withdrawal of the class action allegations is allowed. As modified at the request of the court, the settlement is approved.

## II. Settlement

The Parties submitted their settlement to the court in the form of a proposed judgment. The submission is included in full below. The court's suggested changes are in italics.

### Judgement

HAVING CONSIDERED Plaintiff's Unopposed Motion for Entry of Judgment, *approving settlement of this litigation, the court finds* that:

A.  Defendant Blick Art Materials, LLC ("Defendant") operates certain websites at the address www.dickblick.com, www.utrechtart.com, and www.dickblick.com/ara (the "Websites") at which it offers for sale and sells art supplies;

B.  Plaintiff is a blind individual who claims that Defendant's Website is not fully

accessible to, and independently usable by, *visually impaired* people in violation of Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 et seq. ("ADA"), New York State Human Rights Law, N.Y. Exec. Law, Article 15 (Executive Law§ 290 et seq.), and the New York City Human Rights Law, N.Y.C. Administrative Code§ 8-101 et seq.

C.     Defendant denies that the Website fails to comply with Title III the Americans with Disabilities Act of 1990 ("ADA") or any other applicable laws;

D.     Defendant [*deletion by court*] has: a) been working to improve the overall functionality and accessibility of the Website and the Other Websites; b) been awaiting guidance from the Department of Justice ("DOJ") which has yet to promulgate guidelines on website accessibility; and c) retained a website accessibility technical coordinator to assist it in auditing the Websites and improving accessibility to customers and potential customers who suffer from disabilities.

IT IS HEREBY ORDERED that the Motion *to approve settlement of the case and elimination of class allegations* is granted and that:

1.     Defendant and its parents, subsidiaries, and related entities bring the Websites into substantial conformance with the Web Content Accessibility Guidelines (WCAG) 2.0 Level AA, which are hereby determined by the *court* to be an appropriate standard to judge whether Defendant is in compliance with any accessibility requirements of the ADA, New York State law, or New York City local law on or before December 31, 2019, *implementing changes to the website in a piecemeal fashion, as practicable*.

2.      The *court* shall reasonably modify the accessibility standards applicable to
Defendant's Websites if

> a.      the United States Department of Justice ("DOJ") promulgates a
> final ADA Title III regulation setting out a website accessibility
> technical standard applicable to Defendant's Website and Other
> Websites; or
>
> b.      there are changes to international standards or technology related
> to sighted impaired individuals' access to the internet.
>
> c.      Defendant will take reasonable and necessary efforts to ensure
> legal compliance with the Court's modifications to the settlement.

3.      *The court* shall retain *foot of the decree* jurisdiction to enforce the implementation
of Defendant's compliance with WCAG 2.0 AA, including assessing and
awarding any damages, costs, or legal fees reasonably and necessarily incurred by
Plaintiff's counsel in post-judgment enforcement proceedings.

4.      The Clerk is directed to close *the* case.

### III.   Law

#### A.   American's with Disabilities Act

The purpose of the ADA is "to provide a clear and comprehensive national mandate for
the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1);
*see PGA Tour, Inc. v. Martin,* 532 U.S. 661, 674 (2001) ("Congress enacted the ADA in 1990 to
remedy widespread discrimination against disabled individuals."). Unlike other anti-
discrimination statutes that only prohibit action, the ADA requires individuals and companies, in
some instances, to take affirmative steps to eliminate barriers that inhibit the disabled; in a sense

it prohibits inaction. *See* 42 U.S.C. § 12182(b)(2)(A)(ii) ("[D]iscrimination [under the ADA] includes— . . . a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.").

"Congress concluded that there was a 'compelling need' for a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'" *PGA Tour*, 532 U.S. at 676 (citing the ADA). It provided a "broad mandate" in the ADA prohibiting discrimination against disabled individuals "in major areas of public life." *Id.* at 675. "The 'broad mandate' of the ADA and its 'comprehensive character' are resilient enough to keep pace with the fact that the virtual reality of the Internet is almost as important now as physical reality alone was when the statute was signed into law." *Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 3278898, at *10 -- F.Supp.3d -- (E.D.N.Y. Aug. 1, 2017).

## B. Quasi-Class Action

Although Federal Rule of Civil Procedure 23(e) generally does not require approval of an individual settlement in a putative class action when the settlement does not bind the class, "[u]se of the court's supervisory authority to police the conduct of proposed class actions under Rule 23(d) may be appropriate." David Herr, *Annotated Manual for Complex Litigation* § 21.61 (4th ed. 2013). *cf.* Fed. R. Civ. P. 23(e) (2003) (changing rule to only require court approval of settlements of claims of a *certified* class). Federal Rule of Civil Procedure 41 usually allows dismissal of a case without court approval, but when the statutory scheme indicates the serious

importance of an issue, potential for abuse and ability to effect non-parties, review may be appropriate. *Cf. Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 824 (2016).

This case was filed as a putative class action and the settlement, as a practical matter, may affect many persons, as well as provide standards for website accessibility for the visually impaired in cases involving other providers. A private agreement between individuals that has "many of the characteristics of a class action [] may be characterized properly as a quasi-class action subject to the general equitable power of the court." *In re Zyprexa*, 433 F. Supp. 2d 268, 271 (E.D.N.Y. 2006) (citing Fed. R. Civ. P. 23(g)(1)(C)(iii); Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 1 ("just ... determination of every action"); *see also* Fed. R. Civ. P. 23(e)(1)-(2) (dealing with approval of terms of settlement)); *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1012 (5th Cir. 1977) (noting that the circumstances of the case "created a penumbra of class-type interest on the part of all the litigants and of public interest on the part of the court and the world at large").

The "quasi-class action" label is most often used in the context of Multi District Litigation ("MDL") cases. *See* Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and A Proposal*, 63 Vand. L. Rev. 107, 113 (2010); *but cf.* Linda S. Mullenix, *Dubious Doctrines: The Quasi-Class Action*, 80 U. Cin. L. Rev. 389, 390 (2011). This label may be appropriate in other contexts where relief will accrue to the class through a private individual's settlement of claims.

The relief fashioned in the settlement requires Blick to revise its website in order to make it more accessible to visually impaired individuals. All such individuals wishing to use the defendant's website will benefit from these reforms. Certifying a settlement class in this case

would cause substantial additional expense with little or no added benefit to class members. But, if the court did not use its inherent power to police the settlement, putative class members would be unprotected from the potential for inadequate relief or abuse of the class action vehicle. *See* David Herr, *Annotated Manual for Complex Litigation* § 21.61 (4th ed. 2013) ("[T]he settlement of individual claims [in a putative class action] can represent an abuse of the class action process. For example, a party might plead class allegations to promote forum-shopping or to extract an unreasonably high settlement for the sole benefit of potential class representatives and their attorneys.").

Pursuing a class settlement in the instant case would create a riddle: a putative class member must be given the opportunity to opt out from the class, but the equitable relief here will necessarily inure to the benefit of all putative class members without exception; how could the court protect a putative class member's right to opt-out while still ensuring adequate relief for the class? Unlike monetary relief, which must be affirmatively distributed in aggregate litigations in a fair and equitable way, injunctive relief—public in nature, as is the injunction here—automatically benefits—or burdens—those affected by the settlement. Goals laudable in certain aggregate cases—notice, and other formal mechanism—would be an unnecessary burden here. The critical issue for the court is whether the equitable relief obtained through the settlement is fair and reasonable.

It is noted that counsel in related cases were present to observe the science day hearing that is relied on by the court. *See* Oct. 19, 2017 Hr'g Tr. And at least one case appears to have been settled on the terms now approved. *See* Nov. 28, 2017 Hr'g Tr., *Wu v. Dos Toros LLC,* 17-cv-05121 (E.D.N.Y. filed Aug. 30, 2017); *id.* Letter of Justin Zeller, ECF No. 26, Dec. 14, 2017.

## C. Settlement Standard of Review

In a class action settlement, a district court reviews the settlement to determine if it is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).

The fairness of the substantive terms of a proposed class action settlement is governed by *Grinnell* factors:

(1)     the complexity, expense and likely duration of the litigation;

(2)     the reaction of the class to the settlement;

(3)     the stage of the proceedings and the amount of discovery completed;

(4)     the risks of establishing liability;

(5)     the risks of establishing damages;

(6)     the risks of maintaining the class action through the trial;

(7)     the ability of the defendants to withstand a greater judgment;

(8)     the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9)     the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

"It is proper to consider as *a tenth factor the social utility of the proposed settlement*." *Berkson v. Gogo LLC*, 147 F. Supp. 3d 123, 131 (E.D.N.Y. 2015). This factor "may entail going beyond the four-corners of the complaint, considering issues related to the specific claims alleged, and evaluating how the proposed settlement will impact those issues and persons not in the class." *Id*. Although this is not a class action, these ten factors are useful guideposts in reviewing the settlement.

In other quasi-class actions, courts have used their inherent power to review the reasonableness of fee arrangements and settlement matrixes. *See In re Zyprexa Prod. Liab. Litig.,* 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) ("The large number of plaintiffs subject to the same settlement matrix approved by the court; the utilization of special masters appointed by the court to control discovery and to assist in reaching and administering a settlement; the court's order for a huge escrow fund; and other interventions by the court, reflect a degree of court control supporting its imposition of fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses."); *In re Vioxx Prod. Liab. Litig.*, 650 F. Supp. 2d 549, 559 (E.D. La. 2009) ("[I]t is appropriate for the Court to exercise its equitable authority to examine fee agreements for reasonableness."); *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, No. MDL 05-1708 DWF/AJB, 2008 WL 682174, at *12 (D. Minn. Mar. 7, 2008), *amended in part*, No. MDL 05-1708 DWF/AJB, 2008 WL 3896006 (D. Minn. Aug. 21, 2008) (reviewing a fee award in a quasi-class action).

Given the nature of the injective relief provided for in the settlement, many of the *Grinnell* factors are inapplicable. The court reviews the proposed settlement primarily to ensure that the parties have not abused the class action vehicle by placing individual relief over the rights of the putative class members, *See* David Herr, *Annotated Manual for Complex Litigation* § 21.61 (4th ed. 2013), and to ensure that the injunctive relief is reasonable in light of prevailing technological and community norms.

### D. Sealing Attorneys' Fees

The court allowed the parties to file information about attorneys' fees and supporting documentation under seal. Oct. 24, 2017 Order, ECF No. 39. The parties then jointly moved to

seal portions of the declaration of plaintiff's counsel because it contained fee information.  Mot. to Seal, ECF No. 40, Nov. 22, 2017.

There is a general presumption in favor of allowing access to court documents.  *See U.S. v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).  A three-step process has been constructed by the Court of Appeals for the Second Circuit for determining whether a document may be sealed.  *Id.*

First the court determines whether a document is a "judicial document."  *Id.* at 1048-49.  Whether a document is judicial is determined by seeing if it "bear[s] on the exercise of Article III judicial power."  *Id.*  Only judicial documents are entitled to a strong presumption of access by the public.  *Id.*  If the court finds that a document is judicial and entitled to the presumption of public access, the court then looks to the importance of the document and the weight of the presumption to be afforded on the basis of the document's significance.  *Id.*  The court's "judgment" about whether a document should be sealed is "informed in part by tradition."  *Id.* at 1050.

"Where such documents are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal."  *Id.*  The court balances the presumption against countervailing factors and the interests that the parties seek to protect through sealing.  *Id.* 1050-52.

### IV.  Hearing and Submissions

The court held a combined fairness hearing and "science day" on October 19, 2017.  Plaintiff's attorneys demonstrated the software commonly used by visually impaired individuals to access the internet, known as "screen readers."  They showed webpages that properly functioned with this software, as well as Blick's present website, dickblick.com, which did not

permit the visually impaired to easily navigate the website. The parties also discussed class and quasi-class issues.

The parties submitted additional declarations requested by the court after the hearing. The declarations explained the basis for the attorney fee, the plaintiff's credentials, the availability of training for visually impaired individuals, and the reasonableness of the settlement terms and timeline. *See Infra* Appendixes.

### A. Visually Impaired Users' Access to the Internet

### 1. Screen Reading Software

Visually impaired individuals cannot rely on sight to guide them through the internet. Instead, they rely on "screen readers." Oct. 19, 2017 Hr'g Tr. 7:15-8:5. This software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. *Id.* 16:1-19:21. Many visually impaired individuals use a braille keyboard, in conjunction with the screen reader, to facilitate internet navigation. *Id*. 32:23-25.

The internet is an interactive tool. The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable." *Id.* 13:22-14:2 ("I want to tell the Court you keep hearing the word 'clickable.' So

what the screen reading software is doing it's reading the header and then it'll say it's clickable so that you know it's a function that you can click on.  And if you click on it, you will go to that page. You will hear the word 'clickable' a lot.).  Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

## 2. Visually Impaired Individual's Access to Properly Functioning Websites

Plaintiff Andrew's Attorneys guided the court through the steps a sight impaired individual takes when navigating the internet.  They first demonstrated the screen reading software with several websites that currently comply with the international standards for access by the visually impaired.  Visually impaired individuals, like many of their sighted counterparts, have the basic typing and computer skills to easily access a web browser.  Oct. 19, 2017 Hr'g Tr. 24:5-25:14.  From there, they can access a website or a search engine, such as google.com, which can direct them to the content they seek to access.  *Id.*

Once a visually impaired user has arrived at the appropriate website, she can navigate through the website by listening to prompts from the screen reader.  The plaintiff navigated through the British Broadcasting Corporation ("BBC") website, displayed in figure 1.  As the sighted user will immediately become aware by looking at the home page of this website, it contains an amalgamation of text, links, pictures, and advertisements.  For the visually impaired user, however, this large amount of information can only be revealed by sound.



**Figure 1**

*Australia Citizenship Overhaul Hits Senate Hurdle*, British Broadcasting Company, Oct. 19, 2017, http://www.bbc.com/news/world-australia-41674895 (last visited Nov. 17, 2017).

In order to approximate the experience of a sighted user, a properly functioning website will employ "alternative-tags" and short cuts. The "alternative-tags" for pictures allows the screen reader to read a description of the picture provided by the website. This allows the visually impaired user to get a sense for the entirety of the visual screen that is before her. *Id.* 16:14-17 ("Did you hear how it just read the Australia flags copyright. That was the description

of all of these Australian flags that the image is showing, and it says "Copyright, Getty Images.").

The plaintiff also demonstrated the "skip to content feature." This feature allows the screen reader to bypass the "non-content" text—such as advertisements or links to other webpages—that appears on the screen. *Id.* 15:22-25 ("And instead of going through the menu, I am going to skip right to the content. It'll read the title, the date, the section, the caption and then it'll proceed directly into the story."). This feature saves the visually impaired user time and energy, and allows her to attain parity with the sighted user, who may guide his eyes directly to the main content, bypassing other features as he chooses.

The plaintiff also demonstrated a properly functioning ecommerce page, the ticketing page of the American Museum of Natural History (a relatively simple webpage). This page allows visually impaired users to purchase tickets to the museum online, in a clear, digestible format (Figure 2 displays the website to sighted users). *Id.* 30:2-5 ("So the American Museum of Natural History is a website that allows you to check out in purchasing like Blick does, but the way it's coded you can understand what you're buying.").

| **Figure 2** |
| --- |



American Museum of Natural History Ticketing Page, https://ticketing.amnh.org/#/tickets (last visited Nov. 17, 2017).

This page allows screen reading software to read to the user the type of ticket, the benefits of a particular package, and the price. Once the user is able to toggle through the various options, she may then make her selection. *Id.* 30:14-17 ("I'm an adult, I'm going to pay $28. I'm good with this. I'm going to tab through this link and I hit enter on the 'Get Started.' My keyboard focus was on it and I click enter on the link.").

### 3. Blick's Website

The current functionality for visually impaired users of Blick's main website, www.dickblick.com, was demonstrated at the October 19, 2017 hearing by the plaintiff. It is an ecommerce, art-supply website with many thousands of products sold and millions of pictures. *Id.* 35:11-17. Figure 3 shows a picture of the homepage.

**Figure 3**



departments   a b c d e f g h i j k l m n o p q r s t u v w x y z   gifts   deals   for artists   for educators

enter keyword or item number...    🔍    JOIN OUR EMAIL LIST ►

TODAY'S DEAL    **10% OFF**    ORDERS OF **$49** OR MORE*    PLUS    **FREE SHIPPING** ON ORDERS OF **$35** OR MORE**    EXPIRES 11/18/17 VIEW DETAILS►
USE OFFER **CEKX**
*Exclusions apply. **After discounts have been taken.

## da Vinci TOP ACRYL SYNTHETIC BRUSHES

one week only!
**60% off list**

SHOP NOW

○ ○ ○ ○ ○

**The Best Art Supplies ...at the best discounts!**

**Brands** ▼

**Departments** ▼
Adhesives
Airbrush
Archival Supplies
Books/Media
Brushes
Canvas/Surfaces
Ceramics
Cleaning
Crafts
Cutting Tools
Drafting/Architecture
Drawing/Illustration
   Colored Pencils
   Markers
   Pastels
   Pencils
Easels
Educational Materials
Framing
Furniture
Mosaics
Outdoor Studio
Painting
   Acrylic Paints
   Oil Paints
   Tempera
   Watercolors
Papers/Boards
Pinstriping
Portfolios
Presentation/Display
Printmaking
Safety/Health
Scrapbooking
Screen Printing
Sculpture
Signmaking
Special Needs
Storing/Organizing
Studio Environment
Transporting/Carrying
            see more ...

**Partners** ▼

| Featured Products | Blick Brands | NEW! Products | Clearance |

Yasutomo Japanese Sketch Paper Pads
**Save 25% off List!**

Grumbacher Pre-Tested Artists' Oil Colors
**Save up to 60% off List!**

Sennelier Soft Pastel Sets
**Save up to 72% off List!**

Creative Lettering and Beyond
**Save up to 30% off List!**

X-Acto Basic Knife Set with Case
**Save 25% off List!**

Staedtler Lumograph Drawing and Sketching Pencils
**Save up to 45% off List!**

* guaranteed through **Sunday, November 19, 2017!**

**Teacher's Favorites**

Savage Economy Matboard Packs
**Save up to 10% off List!**

Wexel Art Changeable Display Frames
**Save up to 14% off List!**

Fiskars Scissors For Kids
**Save up to 36% off List!**

**See Also...** School Discounts | Lessons Plans | Art Room Aid | Back to School

**Customers Say...** 💬

Blick has always been a friend to every artist. The catalogs are informative and allow the artist to know their mediums. I recommend Blick especially to young eager artists.
       ... *Sharyne W.*
Complete our web survey!

**ACCOUNT**
My Account
My Orders
My Lists

**CUSTOMER SERVICE**
General Help
Request A Catalog
Take Our Survey
Shipping Information
On-Account Ordering
Sales Tax

**PRODUCT INFORMATION**
General Help
Videos
Product Reviews
Paint Swatches
Product Icon Key
Being Green at Blick
Health & Safety

**QUICK LINKS**
Find A Store
Join Our Email List
About Blick
Careers
Affiliate Program
Link to Us
Privacy & Security
Accessibility

We accept amazon pay
Check out with PayPal

Trustwave Trusted Commerce Click to Validate
VERIFIED & SECURED VERIFY & SECURITY

f 🐦 📷 P ▶ G+

ACCESSIBLE UNDER REVIEW

DICK BLICK ART MATERIALS · P.O. BOX 1267 · GALESBURG, IL 61402-1267 · TOLL-FREE PHONE (800) 828-4548
INTERNATIONAL PHONE +1-309-343-6181 EXT. 5402 · FAX (800) 621-8293

DICK BLICK ART MATERIALS, BLICK®, BLICK STUDIO®, AND ARTIST'S PICK BLICK® ARE REGISTERED TRADEMARKS OF
DICK BLICK HOLDINGS INC. © COPYRIGHT 1999-2017 DICK BLICK HOLDINGS INC. ALL RIGHTS RESERVED.

Blick Art Materials, https://www.dickblick.com. (last visited Nov. 17, 2017).

The plaintiff walked the court through the process a visually impaired user would follow accessing and attempting to purchase a product—in this demonstration, crayons—from Blick's website. The plaintiff began the search for crayons by visiting google.com, a search engine, and typing in "crayons." Oct. 19, 2017 Hr'g Tr. 25:17-27:8. The screen reader then read aloud all of the options listed in the search results, eventually reaching an entry for crayons on Blick's website for Crayola brand crayons (figure 4 displays this page). *Id.* After clicking on the link to Blick's website, the demonstrator explained

> I know that I'm on the Crayola crayons page of the Blick website because the . . . the search [engine] read it out loud. So I understand that I'm on the Crayola crayons page. What I want to do is I want to read the description of the crayons. I want to understand how much they cost, how many crayons I get, what color. And what this website should do is that I should be able to tab directly from the address bar which is where the keyboard focus originally starts. I should be able to tab and hit "skip to content" so I can immediately start going through all of the materials about the crayons.
>
> Unfortunately, what happens with this website is I have to continue tabbing through every single menu option above.

*Id.* 26:10-23.

The plaintiff then demonstrated how a visually impaired user would currently navigate Blick's website:

> Okay. So, right now, I'm on the "My Account" link. I'm going to have to tab through all of these . . . links in order to get to the description of the crayons. So that's what I'm going to do right now, and for the sake of this demonstration, I'm going to click quickly tab through it . . . .
>
> So what happened is I clicked the description of the crayons, and what should happen is that it should also start reading crayons. Even though my mouse is sitting on this text, it's not reading it aloud. So even with the use of the mouse, which a blind person wouldn't have, there is no way for them to understand the description of crayons. So, unfortunately, what will happen is it actually skips from this "100 Percent Satisfaction Guaranteed" link and it skips all the way down to

the bottom, the "See also Crayola construction paper crayon packs." So, with a mouse, I can click through these . . . .

I can click through the tabs that show about the crayons, but I can't access that using the keyboard. So a blind person trying to buy crayons won't actually be able to know what they're purchasing. And this continues scrolling down the page. So even though I don't know what I'm buying, I decided that I want to buy some crayons. What happens is that when I tab through this table that gives the description of the products that I can buy, it will read the item description, literally, just item and description. So it reads the titles of the chart, it doesn't actually end up reading the crayons, the prices, or any description at all. It'll simply give the quantity.

*Id*. 27:12-29:3.

Using this example, the plaintiff identified three interconnected difficulties with Blick's website: (1) product descriptions are not accessible to screen readers; (2) the website can interact only with a point and click mouse system—which visually impaired users do not utilize—but not with a keyboard system—which visually impaired users rely on; (3) the only text that is picked up by the screen reader is the item quantity, which provides little help to a visually impaired user attempting to purchase a product. *Id.* These system errors do not allow a visually impaired user to understand the products (or their price) that she is purchasing from Blick's website.

The plaintiff also demonstrated that Blick's "1(800)" number (listed at the top of figures 3 and 4) shown on the website may not be accessible to visually impaired individuals. The plaintiff claimed that no matter how a visually impaired user attempted to move through the website, it would never be read aloud to the user. *Id*. 21:12-21. Blick, however, contended that the consultant it had hired to bring its website into conformance with modern accessibility standards had verified that it is currently working. *Id.* 39:2-40:4.

**Figure 4**

Find A Store | Sign In | 🛒 cart:0 ($0.00)

ORDER BY PHONE 1-800-828-4548

...k l m n o p q r s t u v w x y z | gifts | deals | for artists | for educators

🔍 | JOIN OUR EMAIL LIST ►

**TODAY'S DEAL** USE OFFER **CEKX** — **10% OFF** ORDERS OF **$49 OR MORE\*** PLUS — **FREE SHIPPING** ON ORDERS OF **$35 OR MORE\*\*** — EXPIRES 11/18/17 VIEW DETAILS> *Exclusions apply. **After discounts have been taken.

Browse more: Crayola · Crayons · Drawing and Illustration

# Crayola Crayons

**100% Satisfaction Guaranteed!**

| description | item specs | photos | reviews |

⬇ **SAVE up to 41% off List!**

⭐⭐⭐⭐⭐ | Read 48 Reviews | Write a Review

Crayola Crayons are famous for their rich, vibrant color. That's why Crayola is the name kids recognize in crayons. Standard crayons measure 3-5/8" long × 5/16" in diameter (92 mm × 8 mm). Sets are packaged in a tuck box, unless otherwise noted.

**832-Piece, 64-Color Classpack** — Celebrate the 50th anniversary of the 64-color crayon box with this Classpack featuring 13 reusable desktop bins. Each bin contains one set of 64 colors, including eight new 2008 Kids' Choice Colors chosen and named by kids. The Classpack also includes two classroom sharpeners.

**Crayons in Bulk** — Replenish the most popular colors in sets and classroom packages as your children use them, break them, and lose them. Keep sets and classroom packs complete. Purchase 12 crayons of one color in a tuck box.

**Multicultural Crayons** — These expressive crayon colors are specially designed for hands-on learning about self, family, and community. The Set of 8 includes the colors Apricot, Burnt Sienna, Mahogany, Peach, Sepia, Tan, and Black and White for blending.

**Set of 12** — Created in response to teacher and student requests, the 12-color set contains Red, Orange, Yellow, Blue, Green, Violet, Brown, Black, White, Gray, Carnation Pink, and Indigo.

**Set of 120** — Experience the colors that generations of children have grown up with — from Red, Yellow, and Blue, to Gold, Copper, and Silver, too! The set contains 120 crayons, each a different color.

**Set of 16** — The 16-color set contains the eight colors listed above, plus Blue-Green, Blue-Violet, Carnation Pink, Red-Orange, Red-Violet, White, Yellow-Green, and Yellow-Orange.

**Set of 24** — The 24-color set contains the 16 colors listed above, plus Gray, Blue-Green, Green-Yellow, Orange-Red, Orange-Yellow, Peach, Violet-Blue, and Violet-Red.

**Set of 48** — The set of 48 colors contains 48 different colors, including Gold and Silver, in a hinged-top box.

**Set of 64** — This hinge-top box contains 64 colors, plus a built-in sharpener.

**Set of 8** — The 8-color set contains Red, Orange, Yellow, Blue, Green, Violet, Brown, and Black.

**Set of 96** — Students can explore a full spectrum of color possibilities, encouraging creativity and flexibility. Flip-top box and tiered sleeves allow for easy access. Has a built-in sharpener.

**Ultimate Crayon Collection, Set of 152** — Please refer to the Item Specs tab for the full listing of included colors.

see also ...
» Crayola Construction Paper Crayon Packs
» Crayola Crayon Classpacks
» Crayola Glitter Crayons
» Crayola Jumbo Crayons
» Crayola Jumbo Crayons Classpack
» Crayola Large Size Crayons
» Crayola Metallic FX Crayons
» Crayola Neon Crayons
» Crayola Triangular Crayons
» Crayola Ultra-Clean Washable Crayons
» Crayola Washable Window Crayons

® Crayola is a registered trademark. ® Classpack is a registered trademark.



**Regular Crayon Set, Set of 8** (enlarge)

Hint — click a thumbnail to enlarge



## Purchase Items

**Bulk Discounts available!** **SAVE up to 41% off List!**

| Item | | Description | | Price ❶ | Bulk! | Qty |
|------|---|-------------|---|---------|-------|-----|
| | | | | **Each** | | |
| 20103-1109 | ⊞ | Regular Crayon Classpack of 832, with 64 Colors | | List $86.13 | **$50.99** 🎁 | 0 |
| 20103-0120 | ⊞ | Regular Crayon Set, Set of 120 | | List $13.64 | **$10.99** 🎁 | 0 |
| 20103-1529 | ⊞ | Ultimate Crayon Collection, Set of 152 | | List $23.07 | **$15.37** 🎁 | 0 |

**Bulk Discounts! →**

| Item | | Description | | Price | Each | 12+ |
|------|---|-------------|---|-------|------|-----|
| 20103-1018 | ⊞ | Multicultural Colors Crayons, Set of 8 | | List $1.09 | $0.98 🎁 | $0.87 |
| 20103-1038 | ⊞ | Regular Crayon Set, Set of 8 | | List $1.09 | $0.98 🎁 | $0.87 |
| 20103-0129 | ⊞ | Regular Crayon Set, Set of 12 | | List $1.73 | $1.29 🎁 | $1.16 |
| 20103-1008 | ⊞ | Regular Crayon Set, Set of 16 | | List $2.65 | $1.95 🎁 | $1.75 |
| | | | | | **out of stock, expected 12/01** | |
| 20103-1019 | ⊞ | Regular Crayon Set, Set of 24 | | List $2.71 | $2.06 🎁 | $1.84 |
| 20103-1029 | ⊞ | Regular Crayon Set, Set of 48 | | List $5.20 | $4.17 🎁 | $3.72 |
| 20103-0649 | ⊞ | Regular Crayon Set, Set of 64 | | List $6.33 | $5.18 🎁 | $4.67 |
| 20103-1969 | ⊞ | Regular Crayon Set, Set of 96 | | List $9.64 | $7.88 🎁 | $7.09 |
| 20103-2009 | ⊞ | Black Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-5009 | ⊞ | Blue Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-8009 | ⊞ | Brown Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-4059 | ⊞ | Gold Crayons, Box of 12 | | List $2.98 | $1.96 🎁 | $1.75 |
| 20103-2569 | ⊞ | Gray Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-7009 | ⊞ | Green Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-4519 | ⊞ | Orange Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-3359 | ⊞ | Peach Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-3059 | ⊞ | Pink Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-6009 | ⊞ | Purple Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-3009 | ⊞ | Red Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-9300 | ⊞ | White Crayons, Box of 12 | | List $2.98 | $1.96 🎁 | $1.75 |
| 20103-1039 | ⊞ | White Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |
| 20103-4009 | ⊞ | Yellow Crayons, Box of 12 | | List $2.44 | $1.96 🎁 | $1.75 |

📋 **add items to my list...**
Select the list to add item(s) to:
(select a list below) ▾ | ✓ add to list
Don't see your lists here? Log in and select one of your saved lists
[BLICK rewards] [ARTAID] [BLICK 101]
ℹ Tell me more about lists...
Saving an item or moving it to a list does not guarantee price or availability.

🛒 **add items to my cart...**
+ add to cart
🛒 Your cart is currently empty.
**Ready to check out?** Go to my cart now (selected item(s) will not be added)
ℹ Tell me more about placing orders...
Prices, promotions, and availability may vary by store, catalog, and online.

**ACCOUNT**
My Account
My Orders
My Lists

**CUSTOMER SERVICE**
General Help
Request A Catalog
Take Our Survey
Shipping Information
On-Account Ordering
Sales Tax

**PRODUCT INFORMATION**
General Help
Videos
Product Reviews
Paint Swatches
Product Icon Key
Being Green at Blick
Health & Safety

**QUICK LINKS**
Find A Store
Join Our Email List
About Blick
Careers
Affiliate Program
Link to Us
Privacy & Security
Accessibility

We accept amazon pay | PayPal | Trustwave | VERIFIED & SECURED


   

DICK BLICK ART MATERIALS · P.O. BOX 1267 · GALESBURG, IL 61402-1267 · TOLL-FREE PHONE (800) 828-4548
INTERNATIONAL PHONE +1-309-343-6181 EXT. 5402 · FAX (800) 621-8293
DICK BLICK ART MATERIAL.SM, BLICK®, BLICK STUDIOS, AND ARTISTS PICK BLICKS® ARE REGISTERED TRADEMARKS OF
DICK BLICK HOLDINGS INC. © COPYRIGHT 1999-2017 DICK BLICK HOLDINGS INC. ALL RIGHTS RESERVED.



Blick Art Materials, Crayola Crayons, https://www.dickblick.com/products/crayola-

crayons/?gclid=EAIaIQobChMI2fnnzq7G1wIVCcNkCh2BFAIDEAMYASAAEgLJo_D_BwE#

description. (last visited Nov. 17, 2017).

Throughout the settlement process, Blick has shown a willingness to improve its

website and processes in order to bring them into conformance with modern accessibility

standards.  Oct. 19, 2017 Hr'g Tr. 33:6-15 ("Blick Art has no design desire to be at odds

with any kind of impaired -- visually impaired, audio impaired, clients or customers.

And, in this case, we are not seeking to litigate against them. We are seeking to be

compliant and we have stipulated [to the WCAG] guidelines."); *see also Infra* Part IV(C).

### 4.  Access to Training and Resources

For many sighted persons, using the internet without sight can seem almost impossible.

THE COURT: Well, I can see how with practice you could understand this. But does this system require, first, a high level of intelligence?  [] I see the plaintiff is shaking his head no. That doesn't mean he doesn't have high level of intelligence, but does it require a high level of education. He's shaking his head no. Does it require extensive training in this system? And he's saying yes.

Oct. 19, 2017 Hr'g Tr. 18:10-19.

The plaintiff explained that with training, most visually impaired individuals can

learn to use screen reading software.

THE COURT: How long would it take to train a person with a GED, average intelligence . . . .

MR. ANDREWS: Your Honor, it took me, because I started back when I was in junior high school, so it took me about a month.

*Id.* 25:8-14.  In Mr. Andrew's opinion, "it is easy to learn how to use screen reading

software."  Andrews Decl. ¶ 7, ECF. No. 41, Exh. 2, Nov. 21, 2017 ("Andrews Decl.") (App. A).

Andrews explained that he is aware of several organizations that provide internet training for the blind including, "Lighthouse, Visions Services for the Blind and Helen Keller Services for the Blind." *Id*. ¶ 8. Andrews himself received training on screen reading software from his middle school in Brooklyn, New York, and this is now a standard part of special education training in New York City. *Id*. ¶ 7.

A declaration submitted by Mark Riccobono, the President of the National Federation for the Blind ("NFB"), outlined the services available to train visually impaired individuals in the use of screen readers. *See* Riccobono Decl. ¶ 6, ECF. No. 41, Exh. 3, Nov. 21, 2017 ("Riccobono Decl.") (App. B). "The NFB is the oldest and largest national organization of blind persons . . . with affiliates in all 50 states, Washington, D.C., and Puerto Rico." *Id*. ¶ 9. To further its mission of "the complete integration of the blind into society," the NFB provides "numerous programs relating to accessible technology." *Id*. ¶¶ 10,12. One program is the

> International Braille and Technology Center for the Blind (IBTC), which is the world's largest and most complete evaluation and demonstration center of adaptive technology used by the blind. At a cost in excess of $2,000,000, the IBTC has collected all categories of access technology for the blind currently available in the United States. The IBTC tests and evaluates that technology and trains blind trainers in their use. In addition, the IBTC publishes reviews of the many speech and Braille programs and devices.

*Id*. ¶ 12.

The IBTC runs a hotline that fields questions from visually impaired individuals about technology. *Id*. ¶ 14. It receives an average of seven inquires a day, most of which are about screen readers. *Id*. "Each year the NFB trains more than 100 trainers, that is blind persons, who teach others in the use of screen reader software." *Id*. ¶ 15. The NFB also maintains three training centers that provide instruction on screen reading software. *Id*. ¶ 43.

In addition to the training provided by the NFB, other free and low-cost screen reading trainings are available. *Id*. ¶ 41. Training is available "online, by telephone or Skype, and in person." *Id*. A recent survey showed that "over half of disabled users of screen reader technology (52%) report that they are proficient using the technology at an advanced level" with 42% percent reporting intermediate proficiency, and only 8% describing themselves as beginners. *Id*. ¶ 42.

Screen readers are "widely available" to visually impaired persons, and are "commonly provide[d]" by state vocational rehabilitation agencies and as a reasonable accommodation at schools. *Id*. ¶ 39. "A 2015 survey of screen reader users reported that 39% of screen reader users purchased their screen readers themselves, while 19% received it from a government agency, 14% received it from their employer, and 17% received it as a free download." *Id*. ¶ 40.

## B. WCAG 2.0 Level AA Guidelines

The parties' settlement calls for Blick to bring its website into compliance with the Web Content Accessibility Guidelines (WCAG) 2.0 Level AA. The parties' described this as the leading and only existing standard for visually impaired internet access. *See* Oct. 19, 2017 Hr'g Tr. 41:7-9.

WCAG is published by World Wide Web Consortium's (W3C) Web Accessibility Initiative (WAI). *See* Riccobono Decl. ¶¶ 64-65. The working group that publishes the guidelines brings together 129 participants plus 26 additional experts. *Id*. ¶ 65. The participants include:

> technology companies, such as Microsoft, Boeing, IBM, Oracle, SAP, Adobe, and Google; publishers and educational services, such as Pearson, Educational Testing Service, VitalSource, and Thomson Reuters; technology accessibility experts, such as SSB Bart Group, Deque Systems, Raising the Floor, and the Paciello Group; and disability groups, such as the Royal National Institute of Blind People.

*Id.*

WCAG 2.0 was published in 2008. *Id.* ¶ 69. It has been "widely accepted as providing for full and equal access in accordance with federal law." *Id.* ¶ 74. A long list of countries, state and local governments, and companies have adopted the WCAG 2.0 guidelines:

> **Countries**: Canada, Australia, Denmark, European Union, Hong Kong, India, Ireland, Israel, Italy, Netherlands, New Zealand, Switzerland, and United Kingdom. In addition, China, France, Germany, Norway, and South Korea have adopted derivatives of WCAG 2.0.
>
> **Companies**: Blackboard, Cengage, Cisco, Deloitte, Elsevier, Microsoft, Oracle, and Uber.
>
> **State and Local Governments**: County of Hawaii, Orange County, Florida, Kansas, Maryland, New York City, and Washington.
>
> **Educational Institutions**: Brandeis University, California Polytechnic University, City University of New York, Yale University, University of Montana, Penn State, Stanford University, Oregon State University, and Ohio State University.

*Id.* ¶¶ 77-79. The NFB uses the WCAG 2.0 Level AA as its own standard for accessibility of its website. *Id.* ¶ 80. And the Federal Government, in implementing the Air Carrier Access Act and the Rehabilitation Act, requires conformance with the WCAG 2.0 Level AA. 14 C.F.R. § 382.43; 36 C.F.R. § 1194, App. A, pt. 205.4; *see also* Riccobono Decl. ¶ 75.

The WCAG 2.0 Level AA guideline is a "stable, referenceable technical standard" that is technology-neutral—i.e., it applies broadly to different web technologies now existing (such as phones, smart watches, and computers), and can also be implemented with future technologies. Riccobono Decl. ¶ 55. It is based upon four principles: a website must be "perceivable, operable, understandable, and robust." *Id.* ¶ 58. The four principles are broken down into twelve guidelines, with "success criteria" for web developers to follow. *Id.* ¶¶ 58, 61. The success criteria provide web developers with tangible goals to work towards, turning the more abstract

principles and guidelines into actionable mandates. The WCAG 2.0 guideline for non-text content provides a useful example:

> **Principle 1: Perceivable** - Information and user interface components must be presentable to users in ways they can perceive.
> **Guideline 1.1 Text Alternatives:** Provide text alternatives for any non-text content so
> that it can be changed into other forms people need, such as large print, Braille, speech,
> symbols, or simpler language.
>
> **1.1.1 Non-text Content:** All non-text content that is presented to the user has a text alternative that serves the equivalent purpose, except for the situations listed below. (Level A)
>
> • **Controls, Input:** If non-text content is a control or accepts user input, then it has a name that describes its purpose. (Refer to Guideline 4.1 for additional requirements for controls and content that accepts user input.)
> • **Time-Based Media:** If non-text content is time-based media, then text alternatives at least provide descriptive identification of the non-text content. (Refer to Guideline 1.2 for additional requirements for media.)
> • **Test:** If non-text content is a test or exercise that would be invalid if presented in text, then text alternatives at least provide descriptive identification of the non-text content.
> • **Sensory:** If non-text content is primarily intended to create a specific sensory experience, then text alternatives at least provide descriptive identification of the non-text content.
> • **CAPTCHA:** If the purpose of non-text content is to confirm that content is being accessed by a person rather than a computer, then text alternatives that identify and describe the purpose of the non-text content are provided, and alternative forms of CAPTCHA using output modes for different types of sensory perception are provided to accommodate different disabilities.
> • **Decoration, Formatting, Invisible:** If non-text content is pure decoration, is used only for visual formatting, or is not presented to users, then it is implemented in a way that it can be ignored by assistive technology.

*Id.* ¶ 61.

There are three "levels" of compliance within the WCAG Guidelines: A, AA, and AAA.

It appears to be the consensus that the AA Level should be used by companies when bringing websites into compliance. As Blick's consultant explained:

the WCAG standard warns: "It is not recommended that Level AAA conformance be required as a general policy for entire sites because it is not possible to satisfy all Level AAA Success Criteria for some content." In practice, level AAA compliance is almost never attempted or reached, except in rare circumstances, as it is extremely difficult to achieve, and does not substantially benefit most disabled users – particularly users who are blind. The general consensus of experts is that Level AA is the appropriate level for the vast majority of organizations to pursue, and all laws which I am aware of require this level as well, including the refreshed Section 508 agency guidelines.

Cannon Decl. ¶ 6, ECF. No. 41, Exh. 5, Nov. 22, 2017 ("Cannon Decl.") (App. C).

WCAG 2.0 Level AA addresses the major barriers the visually impaired encounter, many of which were demonstrated at the science day in this court, such as a failure to provide "alt tags" for pictures, controls that cannot be navigated with the keyboard, and improperly coded navigation that does not allow a screen reader to skip repetitive content. Riccobono Decl. ¶ 52.

W3C has announced that in 2018 it will publish an updated guideline, WCAG 2.1. *Id.* ¶ 70. The new guidelines' primary focus will be on accessibility for those with low vision and learning disabilities, as well as increasing mobile access. *Id.* "WCAG 2.1 is designed to be 'backwards compatible' so websites that conform to WCAG 2.1 will also conform to WCAG 2.0." *Id.* ¶ 71. As of now, it does not appear that WCAG 2.1 will require substantial changes from WCAG 2.0. *Id.* ¶ 70-73.

### C. Implementation and Timeline of Guidelines to Blick's Website

In September 2017, Blick hired a consultant organization, Accessible360 (A360), to conduct an audit and bring its website into compliance with WCAG 2.0 Level AA. Cannon Decl. ¶¶ 1-2, 7. A360's lead engineer, Aaron Cannon, himself a blind individual, has overseen approximately 75 website's transition to compliance with WCAG 2.0 Level AA. *Id.* ¶ 3. A360 is currently conducting an audit of Blick's website in order to develop a compliance plan. *Id.* ¶¶

7-8.  Once the plan is completed, A360 will implement it and then conduct ongoing monitoring and training to ensure continued compliance.  *Id.* ¶ 8.

The parties' settlement calls for a two-year timeline for Blick to implement changes.  *See Supra* Part II.  At the science and settlement hearing, the court urged Blick to, if possible, implement changes to its website piecemeal, in order to provide benefit to users as soon as possible.  *See* Oct. 19, 2017 Hr'g Tr. 37:18-22.  Blick's consultant explained that its process conforms with the court's preference for piecemeal implementation:

> It is likely that users of the Blick website will see a *major improvement* in the accessibility of the site *much sooner than the two year deadline*. Part of the service that A360 provides to all its clients is helping them to identify the most critical issues, so they can address them first. We refer to these issues as "blockers," because they can block a large number of disabled users from completing tasks on the site. Once the blockers are addressed, A360 clients can then move on to fixing the rest of the issues that, while they may pose an inconvenience to disabled users, should not prevent them from using the major functions of the site. Rarely can a business update its site's accessibility all at once. It is much more common to implement these changes piecemeal because it gives the organization a chance to better gauge the impact of the changes, as well as helping the organization deliver incremental improvements to its customers sooner than would otherwise be possible.

Cannon Decl. ¶ 10 (emphasis added).

Blick has already begun to implement changes to its website.  The site now contains an accessibility statement and the toll free number—which the plaintiff claimed was not accessible by screen readers—has been verified as working by A360.  *Id.* ¶ 7.

Both plaintiff and defendant agree that a two-year timeline is reasonable.  Plaintiff's counsel, who has substantial experiences in ADA-access-to-internet cases referred to this time period as the "general market standard."  Oct. 19, 2017 Hr'g Tr. 37:3-17.  Blick's website presents particular compliance difficulties because it has "thousands and thousands of items, [and] millions of pictures."  *Id.* 35:11-17.  Blick's consultant opined:

Given the number of issues A360 has already found on the http://www.dickblick.com site, coupled with the size and complexity of the site, and the number of products on offer there, it is my opinion and experience that two years is a reasonable and not uncommon amount of time to bring this site into substantial compliance with the WCAG 2.0 AA standard. The audit process is underway, but based on information currently available, I believe Blick will be able to achieve this goal by December 31, 2019. During this period, I believe Blick's toll free number will remain accessible to visually impaired people via screen reader technology.

Cannon Decl. ¶ 9.

The plaintiff has expressed his satisfaction with the settlement terms. Andrews Decl. ¶ 10.

### D.  Class and Quasi-Class Action Issues

The court and parties discussed the reasons why the plaintiff abandoned the class action aspect of his case in favor of individual relief. Plaintiff's counsel described three mechanisms for resolving cases like the present litigation.

[Plaintiff's Counsel]:  You can settle them on an individual basis and people just kind of walk away and you drop the case and everybody goes their individual paths. You can attempt to do a class settlement for injunctive relief which my firm has also done, or we can attempt to do what we're doing here which is asking the Court to sign off on the settlement and to retain jurisdiction over disputes arising under the Blick website.

So I'll go through the pluses and minuses of each scenario.

So the first scenario which I described where people just walk away, that is usually the cheapest way for everybody involved. But, unfortunately, that puts defendants in a position of being sued after they've been sued the first time and they've already agreed to update their website and they're getting sued in the interim while they're fixing their website. So to get around that, some parties have decided to just do a class settlement and get a court approval of Rule 23 for injunctive relief, so that if anybody wants to sue [] they would object. But, otherwise, the case, I guess, other plaintiffs would be precluded unless if they were to object or opt-out.

Now, I'm currently doing a class settlement right now with Judge Koeltl in the Southern District. For certain logistical reasons, Judge Koeltl has found that process to be hard and I'm currently working with the Court, with Judge Koeltl, because Judge Koeltl was concerned that there was more opt-out options for the class and

the rationale was because the website is being fixed, everybody is going to be able to enjoy it, so there is no opt-out availability because you're basically on –

THE COURT: I'm not interested in any opt-out. I'm not interested, really, in a class action at this stage. Because if a satisfactory process is established, every sight-impaired person will have it available. So we can cut through the class action and proceed here. I don't think it's res judicata, but I would find it very difficult when we have representatives of these other actions here if this is declared reasonable to go forward on a position for summary judgment in these other cases. I'm not deciding that, but it seems to me that's a reasonable view, and I don't want to go through this again. So I'm prepared to go ahead on this . . . .

Oct. 19, 2017 Hr'g Tr. 45:14-47-6.

The parties have charted a middle ground between a purely individual settlement and resolving the case through the formal strictures of a class action.

## V. Application of Law to Facts

### A. Elimination of Class Allegations

The parties seek the benefits of court review, approval, and continuing jurisdiction, without the costs that would be associated with a class action settlement. Unlike the purely individual settlement, where the court has no role and the defendant has no protection from future suits, charting the course of a quasi-class action provides a degree of assurance that the defendant will be less likely to face suit while updating their websites. The putative class members, who will necessarily be effected by the injunctive relief, are afforded a degree of protection from court review, which ensures that the relief is reasonable. An individual plaintiff is less likely to be bought off when the court reviews the settlement. *See Supra* Parts III(B)-(C).

Given that the injunctive relief in this case will necessarily inure to the benefit of the putative class, the parties have thoroughly negotiated and supported the terms of the settlement, and provided the court the opportunity to review the settlement and suggest changes, it was proper for the plaintiff to settle this case individually. There is no sign of any collusion by the

parties that would prejudice possible class members, and as discussed *infra*, the relief appears to be fair and reasonable.

### B. Reasonableness of Settlement Terms

Given the nature of the injective relief, many of the factors traditionally reviewed by courts in approving class action settlements are inapplicable. The court reviews the proposed settlement primarily to determine that the parties have not abused the class action vehicle by placing individual relief over the rights of the putative class members, *see* David Herr, *Annotated Manual for Complex Litigation* § 21.61 (4th ed. 2013), and to ensure that the injunctive relief is reasonable in light of prevailing technological and community norms.

At science day, the parties demonstrated to the court that with training and access to technology, the visually impaired can, in general, participate more readily in internet age processes. Through the court demonstrations, it was evident that most visually impaired individuals can learn to use the internet with screen reading software, as long as the website was navigable by the screen reader. Blick's website, the plaintiff demonstrated, currently had issues that prevented it from being accessed by users relying on screen readers.

The testimony of Plaintiff Andrews along with the Declaration of Mark Riccobono, the President of the NFB, convinces the court that there is adequate access to training for the visually impaired. Andrews explained that it took him about a month to learn to use the technology and that it does not take a high degree of intelligence to learn to use the software. *See* Oct. 19, 2017 Hr'g Tr. 18:10-19; *Id.* 25:8-14. Mr. Riccobono informed the court that screen readers are "widely available" and training is commonly held at schools and state vocational rehabilitation centers. Riccobono Decl. ¶ 39. The NFB itself trains more than 100 trainers each year. There are online and telephone sources of training available as well. *Id.* ¶¶ 15, 41, 43.

Importantly, the guidelines that the parties have chosen to adopt, the WCAG 2.0 Level AA, appear to be nearly universally accepted. They provide adequate controls to allow visually impaired individuals to access the internet. There is a large list of countries, state and local governments, technology companies, and educational institutions that have adopted these guidelines. The NFB, a leading advocacy organization for the blind, has adopted it, and the federal government has used it. *See Supra* Part IV(B). Blick's technical consultant, who has years of experience making websites accessible to the visually impaired, is "unaware of the existence of any current competing standards." Cannon Decl. ¶ 5.

There are, as of now, no competing standards from the Federal Government. If the government were to promulgate regulations, the parties have given the court the power to modify the settlement in light of those changes which are practicable. The WCAG guidelines are set to be updated in 2018 (*see Supra* Part IV(B)) and the parties have given the court the ability to modify the settlement, if needed, after those changes. *See Supra* Part II. In the absence of competing standards, and through demonstrating that the standards are nearly universally accepted as providing adequate access to the visually impaired, the court can appropriately accept the present guidelines as presently adequate.

Plaintiff Andrews has expressed his satisfaction with the settlement terms. Andrews Decl. ¶ 10. He has been using screen reading software for 20 years, and has extensive knowledge and experience with various ecommerce websites. *Id.* ¶¶ 3,6. He believes that this settlement will allow him and others to better access Blick's website. *Id.* ¶ 10.

The parties have demonstrated that the two-year timeline is reasonable. Blick has already begun working to bring its website into compliance with the WCAG 2.0 Level AA guidelines. *See* Cannon Decl. ¶¶ 6,8. Its technical consultant is using a method that will implement the

changes to the website in piecemeal fashion, focusing first on the most critical issues that are currently blocking access to the visually impaired. *Id.* ¶¶ 7-8. This method will allow the website to see a "major improvement" well before the two-year timeline for total completion. *Id.*

Blick's ecommerce website is unique in scope and complexity. The two-year timeline, while necessary in this case, may not be appropriate as a benchmark timeframe in all cases. The two-year timeframe must be viewed in light of the ongoing partial improvements Blick has agreed to undertake.

## C.    Sealing of Attorneys' Fees and Fee Approval

The parties agree that the fees should be sealed in this case. The court agrees, despite the general presumption in favor of access to court documents. Should an intervening party seek to unseal the fees, the court will revisit its decision.

The parties argue that little weight should be given to the presumption of public access because the information is not relevant to the performance of the judicial function. Mot. to Seal, ECF No. 40, Nov. 22, 2017. They also argue that sealing the documents might protect the attorney-client privilege and work product doctrines, as well as the confidentiality of the negotiations between the parties. *Id.*

This case, a quasi-class action, sits between an individual settlement agreement, which does not ordinarily require court approval, and a class settlement, which does require approval. Because it occupies this middle ground, there is no clear procedural history or tradition. *See U.S. v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (noting that the court's "judgment" about whether a document should be sealed is "informed in part by tradition. Where such documents are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal.").

This settlement, although it will necessarily effect all visually impaired individuals seeking to access Blick's website, more closely resembles an individual settlement than a class settlement. Unlike other quasi-class actions that are large, multidistrict litigations involving thousands of claimants and millions of dollars, this case requires an injunction directing action on the defendant's part. The weight afforded to the presumption of public access is, accordingly, lower than it ordinarily would be. Balancing this weight against the protection of the privilege as well as the confidentiality of the negotiations, the documents should be kept under seal.

The court has reviewed the sealed affidavit of counsel concerning the attorneys' fees and concludes that the negotiated fee is reasonable. The parties skillfully litigated the threshold issue in this case about whether the ADA applies to the internet. *See Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 3278898, -- F.Supp.3d -- (E.D.N.Y. Aug. 1, 2017). There is no reason to believe that the fee negotiated between the parties was not the product of arm's length appropriate bargaining.

Plaintiff's counsel demonstrated skill and experience in shepherding this case through the settlement process. The relief obtained for the putative class in the settlement is fair and adequate. Counsel ably supervised and coordinated the demonstrations at science day and collected and submitted helpful declarations after the hearing. In view of his experience and skill, and the amount of time expended on the case, the award is reasonable.

## VI.    Conclusion

The parties' settlement, including the attorneys' fees, is approved as fair and reasonable. The attorneys' fee information shall remain under seal.

Plaintiff shall promptly provide a copy of the judgment approved by the defendant. The clerk of the court shall close the case upon signing of the judgment of settlement by the court.

SO ORDERED.

<u>/s/ Jack B. Weinstein</u>
Jack B. Weinstein
Senior United States District Judge

December 21, 2017
Brooklyn, New York

## Appendix A

## DECLARATION OF VICTOR ANDREWS

I, VICTOR ANDREWS, under penalty of perjury, affirms as follows:

1.  I am completely blind.

2.  I received a college degree in Radio and Broadcasting Technology from Kingsborough Community College in 2014. I sometimes work as a DJ for parties and live sound events.

3.  My preferred method of shopping is purchasing products online through my personal computer. As opposed to shopping at a physical store, online shopping enables me to purchase products from my home anytime during the day or night. Online shopping also provides me more privacy and security because I can complete a purchase without relying on other's assistance. I frequently buy products such as electronics, food, clothes and accessories online.

4.  I cannot use a computer without the assistance of screen reading software.

5.  When I perform certain functions on a keyboard, screen reading software reads the content of the website and allows me to navigate to the next step.

6.  I have been using screen reading software for approximately 20 years. I received training in how to use screen reading software when I was studying in junior high school, Middle School 142, located at 610 Henry St., Brooklyn, NY 11231.

7.  Middle School 142 provides free training for blind students to teach them how to use screen reading software. In my opinion, it is easy to learn how to use

screen reading software. I became familiar of the screen reading software after one month of using it. All blind individuals now receive screen reading software training as part of their special education training.

8.     I know there are also other institutions that provide training for blind individuals, such as Lighthouse, Visions Services for the Blind and Helen Keller Services for the Blind.

9.     I frequently find websites that contain accessibility barriers. The barriers prevent me from using screen reading software to access products and services.

10.     I am satisfied with the settlement of this matter. Making Defendant's websites comply with WCAG 2.0 AA standard will enable me and other blind individuals to access Defendant's products and services using screen reading software.

I affirm, under penalty of perjury, that the above and foregoing information is true and correct.

Dated: _Nov. 21_, 2017          VICTOR ANDREWS

**Appendix B**

**DECLARATION OF MARK RICCOBONO, PRESIDENT, NATIONAL FEDERATION OF THE BLIND**

I, Mark Riccobono, do hereby declare that:

**Background and
Qualifications**

1. I am over eighteen years of age and am competent to make this Declaration.

2. I am legally blind.

3. Attached hereto as Exhibit A is a copy of my curriculum vitae.

4. I received a bachelor's degree in Business Administration from the University of Wisconsin in 1999 and a Master of Science degree in Educational Studies from Johns Hopkins University in 2009.

5. I read Braille and use screen reader software to access websites.

6. I have been President of the National Federation of the Blind (NFB) since 2014. I have worked in the field of blindness for 17 years, beginning as the Director of the Wisconsin Center for the Blind and Visually Impaired from 2000 to 2003.

7. I have worked for the NFB for 14 years, first as Director of Education for the NFB Jernigan Institute from 2003 to 2007, then as Executive Director of the NFB Jernigan Institute from 2007 to 2014.

8. I was appointed to the Federal Commission on Accessible Instructional Materials (AIM) in Postsecondary Education in 2011.

9. The NFB is a non-profit corporation headquartered in Baltimore, Maryland.

The NFB is the oldest and largest national organization of blind persons. It has affiliates in all 50 states, Washington, D.C., and Puerto Rico. The NFB and its affiliates are recognized by the public, Congress, executive agencies of state and federal governments, and the courts as a collective and representative voice on behalf of blind Americans and their families.

10. The ultimate purpose of the NFB is the complete integration of the blind into society on a basis of equality. This objective includes the removal of legal, economic, and social discrimination.

11. As part of its mission and to achieve these goals, the NFB has worked actively to ensure that the blind have an equal opportunity to access the internet and other emerging technology.

12. The NFB provides numerous programs relating to accessible technology, including the International Braille and Technology Center for the Blind (IBTC), which is the world's largest and most complete evaluation and demonstration center of adaptive technology used by the blind. At a cost in excess of $2,000,000, the IBTC has collected all categories of access technology for the blind currently available in the United States. The IBTC tests and evaluates that technology and trains blind trainers in their use. In addition, the IBTC publishes reviews of the many speech and Braille programs and devices.

13. The principal concern of access technology is the use of technology to afford persons with disabilities, in this instance blind persons, with access to information. Today, information is increasingly presented in a visual electronic format. The internet, in particular, has become an ever more significant source of information for

blind persons, just as it has for the sighted.

14. The International Braille and Technology Center receives, on average, seven telephonic inquiries daily, typically from blind persons. The majority of these inquiries concern screen reader software.

15. Each year the NFB trains more than 100 trainers, that is blind persons, who teach others the use of screen reader software.

16. The NFB maintains up-to-date lists of assistive and accessible technology resources, devices, and software; tests the accessibility of technologies; and partners with technology developers to develop new assistive technologies and improve the accessibility of mainstream technologies.

17. The NFB also conducts and supports academic and other research into blindness and the issues affecting blind people, including the Jacobus tenBroek Library, a research and resource center on the non-medical aspects of blindness. The Library provides researchers with materials about blindness from the perspective of the blind.

18. The NFB publishes the Journal of Blindness Innovation and Research (JBIR), a multidisciplinary publication presenting primary research, scholarly reviews, and reports of innovative information and research related to the blind. JBIR publishes research and professional discourse that broadens and deepens our understanding about blindness and the best practices for increasing the independence, self-respect, self-determination, and potential of individuals who are blind.

19. The NFB also provides educational programs for the blind and for sighted individuals, including STEM education and resources, Braille Literacy, Early Child

programs, and the BELL  Academy.

## Blind Access to
## Websites

20. Blindness is a disability whose incidence is on the increase. As the American population  lives longer, as the baby boomers age and as the incidence of diabetes increases, vision loss is on  the rise. The fastest growing group of newly blind people is seniors. Many of these seniors made  use of computers and the internet before their vision loss.

21. Prior to the widespread availability of digital technologies, such as websites and ebooks,  print materials posed a significant obstacle to access to information, education, and other aspects   of community life for the blind.  The blind could access print materials only if the materials were  converted to Braille or if they were read by a human reader, either live or recorded.

22. Although human narration was once the best access a blind reader could receive to print  materials, websites have advanced far past the capabilities of human narration, making human  narration substantially inferior to use of accessible websites.

23. Providing a live human reader, such as via a telephone line, would be expensive or  burdensome, both for a business offering a website staffed at all hours that a website is available  (24 hours a day, 7 days a week, 365 days a year) and for family members or friends of blind  individuals.

24. Live reading takes more time than "surfing" or "browsing" a website.  Live readers  cannot increase their speed – they are inherently limited to the pace they can reasonably read  aloud.  Live reading also raises the potential of inaccuracies,

particularly if the reader is not very familiar with the material or lacks the educational level appropriate to the material. Moreover, live readers' orations cannot be reproduced, giving the blind reader only one opportunity to hear the material.

25. Recorded human narration can address some of these issues, such as accuracy, repetition, and speed, but presents its own problems. Frequently, it will take six months to more than a year for a blind person to receive a requested recording of a textbook from an entity like Learning Ally. Recordings of websites are virtually unheard-of; and it would be impractical to provide, or to rely on, audio recordings of websites because websites change frequently, making delays unacceptable and making it infeasible to maintain the currency of recordings. Moreover, recorded human narration cannot be navigated, searched, or skipped through like an accessible website and will not allow a reader to hear each character to discern spelling.

26. Blind people access websites with a screen reader or built-in text-to-speech software, both of which can output information either as a computerized vocalization of the text or as Braille through a user-provided refreshable Braille display device.

27. Unlike websites narrated by human readers, accessible websites can be read by a screen reader as quickly as the reader wants, or even skimmed. Further, they provide search and navigation capabilities, allowing visitors to skip to items of particular interest, jump from page to page, or item to item, as well as discern spelling. This allows blind website visitors to use a website much like a sighted visitor may do.

28. Through my work, I am familiar with the use of screen reader software by the blind and visually-impaired community to access the internet and perform other

computer functions. The  use by the blind of screen reader software has become

widespread. For example, although I do  not have recent statistics about the precise

number of blind screen reader users, a 2001 article  estimated that there were 1.5

million visually-impaired computer users, and 200,000 internet users with a "severe

limitation in seeing." Gerber, Elaine and Kirchner, Corrine, Who's Surfing?  Internet

Access and Computer Use by Visually Impaired Youth and Adults, Journal of Visual

Impairment & Blindness, 95 (3), 176-181 (2001). This article is available on the AFB

website at

https://www.afb.org/jvib/newjvibabstract.asp?articleid=/JVIB/JVIB950308.

    29. Because of the greater availability and lower costs of screen reader technology

since  2001, as well as the greater prevalence of vision impairments as the Baby

Boomer generation has  aged, it is likely that the number of blind screen reader users

trying to access the Internet has  grown since 2001.

    30. Except for a blind person whose residual vision is still sufficient to use

magnification,  screen reader software provides the only method by which a blind

person can independently  access the internet.

    31. Screen readers are software programs or applications that convey digital text

aloud in a  computerized voice or as Braille text displayable on an individual's

Braille display device.

    32. Several screen readers are available to blind users of Windows® and Apple

operating  system-enabled computers.  While each screen reader may have differences

in how the user  operates the software, each allows the information available to sighted

persons to be rendered in  text, audio, or Braille.

33. Although current data are unavailable and the number of screen reader offerings has both  expanded (adding platform-specific screen reader software such as Talkback and VoiceOver)  and contracted (Window-Eyes was discontinued) over the last several years, the most common  screen reader continues to be Job Access With Speech, or "JAWS." A 2015 survey reported that  approximately 30% of screen reader users, and 39% of blind screen reader users, use JAWS. https://webaim.org/projects/screenreadersurvey6/ (Primary Screen Reader).  JAWS costs approximately $900-$1,100 and can be used with all 32-bit or 64-bit versions of Windows® 10,  Windows 8.1, and Windows 7 along with Windows Server 2008 and 2012, including with  Microsoft Office, Internet Explorer, Firefox, and more.

34. ZoomText Magnifier/Reader is another popular screen reader, being used by  approximately 22% of screen reader users in 2015. https://webaim.org/projects/screenreadersurvey6/ (Primary Screen Reader). However, ZoomText is used more by people with low vision than by blind people, because of its focus on  magnification.  *Id.*

35. For Apple users, the predominant screen reader is VoiceOver, which is built in to the  Apple operating system.  As of 2015, approximately 8% of screen reader users used VoiceOver  when using a computer (and 57% of screen reader users used VoiceOver on mobile devices).  https://webaim.org/projects/screenreadersurvey6/ (Primary Screen Reader and Mobile Screen Readers Used).   Microsoft also offers a built-in light-duty screen reader, called Narrator, in  Windows®.  For Android users, TalkBack is a built-in screen reader for Android mobile devices.

36. NVDA (Nonvisual Desktop Access) is a free open-source downloadable screen reader that works with Microsoft Windows® to read text on a computer screen in a computerized voice or convert the text to Braille. As of 2015, approximately 15% of screen reader users, and 17% of blind screen reader users, used NVDA. https://webaim.org/projects/screenreadersurvey6/ (Primary Screen Reader).

37. In addition to serving blind people, screen readers provide important benefits for people with learning disabilities such as dyslexia, because they can highlight words in text while pronouncing them audibly. Screen readers also benefit people with manual dexterity disabilities who cannot use a mouse.

38. While specific data are unavailable to estimate the number of blind people who have access to screen reader technology, many do.

39. Screen reader technology is widely available to blind people because it is built in to mainstream technologies, such as Apple's VoiceOver and Android's TalkBack or because it is free, such as NVDA, or low-priced. In addition, state vocational rehabilitation agencies commonly provide JAWS or other screen readers for blind individuals seeking or gaining employment. Employers and schools often provide screen readers as a reasonable accommodation for employees and students with vision disabilities pursuant to the Americans with Disabilities Act (ADA) and the Individuals with Disabilities Education Act (IDEA).

40. A 2015 survey of screen reader users reported that 39% of screen reader users purchased their screen readers themselves, while 19% received it from a government agency, 14% received it from their employer, and 17% received it as a free download.

https://webaim.org/projects/screenreadersurvey6/ (How Obtained).

41. Many sources of training on how to use the most common screen readers are available online, by telephone or Skype, and in person. Many of these are free or low-cost. In addition, most screen reader providers offer accessible text information on how to use their technology. Finally, individualized or advanced training can be purchased from several providers.

42. A survey of screen reader users by WebAIM in 2015 showed that over half of disabled users of screen reader technology (52%) report that they are proficient using the technology at an advanced level. https://webaim.org/projects/screenreadersurvey6/ (Screen Reader Proficiency). 48% of all responders (with and without disabilities) reported that they were proficient at an intermediate level, while only 8% reported that they were beginners.

43. NFB offers three Training Centers, in Louisiana, Colorado, and Minnesota, that provide training on blindness skills, including screen reader use, for children, adults, and seniors.

44. Unlike printed content, digital content is not inherently visual (or audible or tactile) and so can be made accessible to any or all of those senses.

45. When digital textual content is properly formatted for use with screen reader software, it is universally available to the sighted and blind alike and does not require the re-creation of text in a separate format. When properly formatted, content will (1) be susceptible to manipulation with keyboard commands (as opposed to mouse only); (2) have headings in the coding that offer nonvisual organization to complex pages as an alternative to a visual layout: (3) label links, edit boxes, and dropdown boxes

accurately; and (4) describe images in screen readable text.

46. Websites that are compatible with screen readers provide significant search and navigation capabilities, allowing readers to jump from section to section, page to page, and item to item, as well as discern spelling. This allows blind readers to re-read certain sections of a work they might not grasp on the first pass, just as a sighted reader may re-read a complicated passage.

47. Not all digital information is accessible. For example, scanning a copy of print material usually results in a file in portable document format (PDF). PDFs are created essentially by taking a picture of the page. This gives a sighted person enough to read on a computer screen, but it does not allow screen reader software to recognize the text.

48. However, materials that are originally created for digital display, or "born digital," rather than scanned from print material do not have to be manually tagged.

49. Technology has the potential either to further exclude the blind from the social, economic, and commercial life of this country or to integrate the blind more closely into our country's fabric.

50. Unfortunately, with increasing frequency, the blind face gratuitous barriers to entry; that is, the blind are confronted with barriers, even when the state of the art technology offers an alternative to sight-based entry or when there would be no significant added cost to accessibility. These barriers frequently arise from a failure to consider the blind as full members of society or from a lack of awareness of the adaptive techniques used by the blind. See https://www.w3.org/standards/webdesign/accessibility#examples for an introduction

to some of these barriers and their solutions.

51. These barriers are easily avoided if website designers ensure that the following principles are followed. All page content should:

- Be susceptible to manipulation with keyboard commands (as opposed to mouse only); for standard text, a developer should use actual text rather than screenshots, pictures of tables, or other images of text when possible. For custom web controls, the developer should incorporate the appropriate keyboard JavaScript handlers for detection of the keyboard;

- Have headings in the coding that offer nonvisual organization to complex pages as an alternative to a visual layout: Each page should have its sections indicated using HTML headings <h1>, <h2> etc. Headings should be used to mark distinct sections of a page and to convey hierarchical structure;

- Label all interactive elements of a page correctly. All text links should clearly indicate the destination, rather than using terms like "Click Here." Form controls such as edit fields, drop down lists, check boxes, and radio buttons, should have a clear label tag which states what is desired for that field; and

- Describe images in screen readable text. All graphics, unless used for purely decorative purposes, must have an alt attribute (alt= "some text"). These alt attributes must provide a brief and concise description of the contents and main purpose of the image.

52. WCAG 2.0 Level AA addresses the major barriers that blind people encounter when using inaccessible websites, such as images, buttons, and fillable forms that do not have text descriptions ("alt-text") that can be read by a screen reader; CAPTCHAs that do not have audio options, buttons and controls that can only be operated by a mouse and not with keyboard controls; navigation that is not tagged so a screen reader can read it in the proper order or that does not allow a screen reader to skip repetitive coding and content; and pages that "time out" before a screen reader can complete them.

53. WCAG 2.0 Level AA is sufficient to meet the needs of most blind users without imposing heavy burdens on website developers. For example, unlike Level AAA, Level AA does not require provision of prerecorded synchronized sign language for prerecorded audio, extended audio description, high contrast ratios for text, elimination of background noise for audio, customizable screen background colors and text sizing, or error prevention mechanisms, which can be expensive or technologically advanced. Nor does Level AA require changes to line spacing or size, elimination of time limits, or specific types of text descriptions of links, titles, and headings, which may impact an author's design and content decisions.

### Web Content Accessibility Guidelines Meaning and Implementation

54. The NFB supports the application of the World Wide Web Consortium's (W3C) Web Content Accessibility Guidelines (WCAG) 2.0 Level AA as a standard for assessing and remediating the accessibility of websites. The WCAG 2.0 standard is available at https://www.w3.org/WAI/intro/wcag.

55. WCAG 2.0 is a stable, referenceable technical standard. It was published by

the W3C in 2008. WCAG 2.0 is technology-neutral, meaning it is designed to apply broadly to different Web technologies now and in the future. Thus, WCAG 2.0 applies to websites, as well as mobile applications and devices (https://www.w3.org/TR/mobile-accessibility-mapping/), digital TVs, smart watches, automobile and airplane devices, and household appliances, and other "internet of things" devices. https://www.w3.org/WAI/mobile/.

56. The WCAG 2.0 standard and large amounts of supporting and explanatory material are available for free online from W3C.

57. WCAG is primarily intended for: web content developers (page authors, site designers, etc.), web authoring tool developers, web accessibility evaluation tool developers, and others who want or need a standard for web accessibility, including for mobile accessibility. https://www.w3.org/WAI/intro/wcag.php. It is not intended as an introduction to website accessibility.

58. WCAG 2.0 has four principles that accessible websites must achieve: perceivable, operable, understandable, and robust. Within these four principles are 12 guidelines describing the meaning of the principles.

59. W3C provides the following summary of WCAG's principles and guidelines:

1. Perceivable - Information and user interface components must be presentable to users in ways they can perceive.

- This means that users must be able to perceive the information being presented (it can't be invisible to all of their senses)

2. Operable - User interface components and navigation must be operable.
   - This means that users must be able to operate the interface (the interface cannot require interaction that a user cannot perform)

3. Understandable - Information and the operation of user interface must be understandable.
   - This means that users must be able to understand the information as well as the operation of the user interface (the content or operation cannot be beyond their understanding)

4. Robust - Content must be robust enough that it can be interpreted reliably by a wide variety of user agents, including assistive technologies.
   - This means that users must be able to access the content as technologies advance (as technologies and user agents evolve, the content should remain accessible)

If any of these are not true, users with disabilities will not be able to use the Web. https://www.w3.org/TR/UNDERSTANDING-WCAG20/intro.html#introduction-fourprincs-head.

60. WCAG provides guidelines for each principle:

1. Perceivable
   1.1 Provide **text alternatives** for non-text content.
   1.2 Provide **captions and other alternatives** for multimedia.
   1.3 Create content that can be **presented in different ways**, including by assistive technologies, without losing meaning.
   1.4 Make it easier for users to **see and hear content**.

2. Operable
   2.1 Make all functionality available from a **keyboard**.
   2.2 Give users **enough time** to read and use content.
   2.3 Do not use content that causes **seizures**.
   2.4 Help users **navigate and find content**.

3. Understandable
   3.1 Make text **readable and understandable**.
   3.2 Make content appear and operate in **predictable** ways.
   3.3 Help users **avoid and correct mistakes**.

4. Robust
   4.1 Maximize **compatibility** with current and future user tools.

https://www.w3.org/WAI/WCAG20/glance/.

61. For each guideline, WCAG provides testable success criteria at three levels: Level A, Level AA, and Level AAA. For example, the testable success criteria for Principle 1, Guideline 1, regarding non-text content, such as pictures, controls or buttons, animations, and audio recordings, provides:

> **Principle 1: Perceivable** - Information and user interface components must be presentable to users in ways they can perceive.

> **Guideline 1.1 Text Alternatives:** Provide text alternatives for any non-text content so that it can be changed into other forms people need, such as large print, Braille, speech, symbols, or simpler language.

> **1.1.1 Non-text Content:** All non-text content that is presented to the user has a text alternative that serves the equivalent purpose, except for the situations listed below. (Level A)

> - **Controls, Input:** If non-text content is a control or accepts user input, then it has a name that describes its purpose.
> - **Time-Based Media:** If non-text content is time-based media, then text alternatives at least provide descriptive identification of the non-text content.
> - **Test:** If non-text content is a test or exercise that would be invalid if presented in text, then text alternatives at least provide descriptive identification of the non-text content.
> - **Sensory:** If non-text content is primarily intended to create a specific sensory experience, then text alternatives at least provide descriptive identification of the non-text content.
> - **CAPTCHA:** If the purpose of non-text content is to confirm that content is being accessed by a person rather than a computer, then text alternatives that identify and describe the purpose of the non-text content are provided, and alternative forms of CAPTCHA using output modes for different types of sensory perception are provided to accommodate different disabilities.
> - **Decoration, Formatting, Invisible:** If non-text content is pure decoration, is used only for visual formatting, or is not presented to users, then it is implemented in a way that it can be ignored by assistive technology.

https://www.w3.org/TR/WCAG20/.

62. WCAG 2.0 does not specify particular codes that must be in place to make a website accessible. Rather, website developers have flexibility to determine how best to accomplish the four principles. Rather, it provides in-depth descriptions, scenarios, educational materials, and

practical techniques for meeting the guidelines.

https://www.w3.org/WAI/WCAG20/quickref/?showtechniques=111#qr-text-equiv-all.

63. W3C provides a suite of tools and resources for evaluating accessibility of websites.

https://www.w3.org/WAI/eval/Overview.  These include simple checks, an evaluation

methodology, a guide for involving people with disabilities in evaluations, evaluation approaches

for specific contexts, web accessibility evaluation tools, and templates for reporting on website

accessibility.

## Web Content Accessibility Guidelines Development Process

64. W3C's Web Accessibility Initiative (WAI) develops web accessibility standards,

including WCAG 2.0.  WAI's Accessibility Guidelines Working Group develops web

accessibility guidelines.

65. The Accessibility Guidelines Working Group has 129 participants plus 26 invited

experts.  Participants include technology companies, such as Microsoft, Boeing, IBM, Oracle,

SAP, Adobe, and Google; publishers and educational services, such as Pearson, Educational

Testing Service, VitalSource, and Thomson Reuters; technology accessibility experts, such as

SSB Bart Group, Deque Systems, Raising the Floor, and the Paciello Group; and disability

groups, such as the Royal National Institute of Blind People.

66. W3C working groups, including the Accessibility Guidelines Working Group, strive to

make most decisions based on consensus. W3C has a robust process for developing, adopting,

and publishing technical reports, such as WCAG 2.0.  https://www.w3.org/2017/Process-

20170301/. To advance from one phase to the next, a report must be approved by the Working

Group and by the Director and must provide public documentation of any substantive changes,

must formally address all issues raised in previous phases, and must publicly document any formal objections.

67. Each report goes through a Working Draft phase, in which it is published for wide review by W3C members, the public, and other technical organizations. A document is published as a Candidate Recommendation after it has been widely reviewed, seeking final reviews and implementation experiences from the community. Implementation experience is required to show that the standard is sufficiently clear, complete, and relevant.

68. Thereafter, the report becomes a Proposed Recommendation, at which point the W3C Director and W3C Members determine whether the document is of sufficient quality to become a W3C Recommendation. A W3C Recommendation receives the endorsement of W3C Members and the Director and is recommended for wide deployment as web standards.

69. WCAG 1.0 was published in 1999. WCAG 2.0, published in 2008, applies to more advanced technologies, including mobile technologies; is easier to understand and use; and is more testable than WCAG 1.0. When W3C released WCAG 2.0, it also provided extensive guidance on moving from WCAG 1.0 compliance to WCAG 2.0 compliance and ensured that most websites that conform to WCAG 1.0 would not require significant changes in order to conform to WCAG 2.0, and some would not need any changes at all.

70. W3C has announced that it expects to release WCAG 2.1 in 2018. The primary focus for WCAG 2.1 is accessibility requirements for people with low vision and cognitive and learning disabilities, and mobile accessibility. https://www.w3.org/WAI/WCAG20/wcag2faq#v21.

71. WCAG 2.1 is designed to be "backwards compatible" so websites that conform to WCAG 2.1 will also conform to WCAG 2.0 — which means that a website that meets WCAG 2.1 will meet the requirements of policies that reference WCAG 2.0. Therefore, if a court

requires a website to comply with WCAG 2.0 and the website developer subsequently decides to make the website comply with WCAG 2.1, the website will still satisfy the court's order.

72. The current draft proposal for WCAG 2.1 includes the WCAG 2.0 success criteria unchanged. In later drafts, the WAI Working Group could modify some WCAG 2.0 success criteria "to reduce duplication and increase clarity" and is currently seeking public comment on whether to incorporate WCAG 2.0 success criteria unchanged or to modify them to reduce duplication and increase clarity.

73. Even if WCAG 2.1 were to be substantially different from WCAG 2.0, that would not undermine a court order requiring compliance with WCAG 2.0. WCAG 2.1 is a voluntary standard, and websites are not mandated to upgrade to it. However, if a website is upgraded to WCAG 2.1, it will remain compliant with WCAG 2.0.

## Web Content Accessibility Guidelines Prevalence

74. The WCAG 2.0 AA standards are widely accepted as providing for full and equal access in accordance with federal law. W3C's Web Accessibility Initiative offers further resources including educational materials on web accessibility and working groups to improve the online experience for people with disabilities.

75. WCAG 2.0 AA has been accepted throughout the web industry and has been adopted by the federal government as the standard for providing for full and equal access in accordance with federal law under the Air Carrier Access Act, 14 U.S.C. § 382.43(c)(1) ("Your primary Web site must conform to all Success Criteria and all Conformance Requirements from the World Wide Web Consortium (W3C) Recommendation 11 December 2008, Web site Content Accessibility Guidelines (WCAG) 2.0 for Level AA…"), and Section 508 of the Rehabilitation Act, 36 C.F.R. Part § 1194, Appendix A, E205.4 ("E205.4 Accessibility Standard. Electronic content shall

conform to Level A and Level AA Success Criteria and Conformance Requirements in WCAG 2.0…").

76. WCAG 2.0 AA has also been applied as a standard for remedying inaccessible websites and other digital technologies under the Americans with Disabilities Act in approximately 25 settlements by the U.S. Department of Justice and OCR settlements.

77. Other countries have widely adopted WCAG as their standards for accessibility of digital technologies. Countries who have incorporated WCAG 2.0 as their web accessibility standard include Canada, Australia, Denmark, European Union, Hong Kong, India, Ireland, Israel, Italy, Netherlands, New Zealand, Switzerland, and United Kingdom. In addition, China, France, Germany, Norway, and South Korea have adopted derivatives of WCAG 2.0.

78. Technology companies and other companies have widely adopted WCAG as their standard for accessibility of their own websites and other technologies. A few of the companies publicly stating their use of WCAG 2.0 as their website accessibility standard include Blackboard, Cengage, Cisco, Deloitte, Elsevier, Microsoft, Oracle, and Uber.

79. State and local governments, such as the County of Hawaii, Orange County, Florida, Kansas, Maryland, New York City, and Washington, as well as educational institutions, such as Brandeis University, California Polytechnic University, City University of New York, Yale University, University of Montana, Penn State, Stanford University, Oregon State University, and Ohio State University, have also adopted WCAG 2.0 as the accessibility standard for their websites and other technologies.

80. The NFB uses WCAG 2.0 Level AA as the standard for accessibility of its own website. See https://nfb.org/accessibility-policy.

81. Many web accessibility consultants are available to assist businesses and others who want to make their websites accessible in accordance with WCAG 2.0.  See, e.g., https://nfb.org/web-accessibility-consultants.   In addition, although automated accessibility testing tools need to be supplemented with manual checks, there are a variety of testing tools available to check the

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of November, 2017.

_____
Mark Riccobono
President
National Federation of the Blind

# Exhibit A
# To  Appendix B

# Mark A. Riccobono

1720 S CHARLES STREET, BALTIMORE, MARYLAND 21230
410-659-9314;   officeofthepresident@nfb.org

## PROFESSIONAL EXPERIENCE

2014-Present                    National Federation of the Blind                                    Baltimore, MD
*President*

- Develop and implement policies and programs for the blind
- Direct professionals and volunteers in the evaluation, development and usability of technologies by the blind.
- Articulate an authentic understanding of blindness and the barriers faced by blind people.
- Synthesize the priorities and perspectives of a diverse community of blind people into actionable plans.

2014-Present                    American Action Fund for Blind Children and Adults                    Baltimore, MD
*Director of Education*

- Develop and implement programs to assist blind children and adults.
- Develop partnerships to advance the organization's missions.
- Research innovative approaches to enhancing services for blind children and adults.

2007-2014                    National Federation of the Blind                                    Baltimore, MD
*Executive Director, Jernigan Institute*
- Developed strategic partnerships to execute innovative education, rehabilitation, technology, research, and outreach projects to help the world's blind achieve independence.
- Raised and administered multi-million dollar budget.
- Developed and led a team of world-class experts in the education and rehabilitation of the blind.

2003-2007                    National Federation of the Blind                                    Baltimore, MD
*Director of Education, Jernigan Institute*
- Identified, developed, and directed educational programs for the NFB Jernigan Institute, including:
  o National Center for Blind Youth in Science
  o National Literary Braille Competency Test
  o NFB Online Education Program
- Built partnerships to develop innovative educational programs for blind youth.

2000–2003                    Wisconsin Center for the Blind & Visually Impaired                    Janesville, WI
*Center Director*

- Directed activities of state agency with ninety employees and $6.1 million budget.
- Ensured quality training and service provision in accordance with state and federal statutes.
- Built partnerships with consumers, families, school districts, legislators, community leaders, and others to create innovative opportunities and collaboration.

## EDUCATION

2005–2009                    Johns Hopkins University                                    Baltimore, MD
                             Master of Science—Educational Studies


1994–1999                    University of Wisconsin                                    Madison, WI
                             Bachelor in Business Administration
                             Majors in marketing and economics with a specialization in international business

## APPOINTED POSITIONS

Federal Commission on Accessible Instructional Materials (AIM) in Postsecondary Education (2011)   Wisconsin State Plan Committee for the Implementation of the Help America Vote Act (2003)   Wisconsin State Superintendent's Blind and Visual Impairment Education Council (2000)
Wisconsin Statutory Council On Blindness (1999-2002)  Madison Commission on People With Disabilities (1999)

**Appendix C**
**DECLARATION OF AARON CANNON**

I, Aaron Cannon, on oath, declare that I have personal knowledge of the facts in this declaration and if called as a witness in this matter, I would testify as follows:

1.      I am a website developer and have been working in the field of website accessibility professionally since 2007.  I led the design for user experience on the National Industries for the Blind's 75th anniversary website (http://www.nib.org/75th-anniversary).  I have been engaged in website development generally since 1996.  I am totally blind and have been using assistive technology, including screen readers, since 1988.

2.      I am the Lead Accessibility Engineer and Co-Founder of Accessible360 ("A360").  A360 consults with businesses on how to make their websites and other digital content accessible to people with disabilities.  A360 engages in live-user audits of sites, applications and documents to help businesses assess issues which may pose impediments to accessibility.  A360 then assists businesses with a plan of implementing the Web Content Accessibility Guidelines ("WCAG") 2.0 AA standard. Following a business's implementation of accessibility features that comply with WCAG 2.0 AA, A360 engages in quality assurance testing, ongoing technical support and live-user monitoring to help that business remain compliant with WCAG 2.0 AA.

3.      In my work as an Accessibility Engineer, I have overseen, or am in the process of overseeing, approximately 75 projects involving the implementation of the WCAG 2.0 AA standard on websites.

4.      The World Wide Web Consortium (W3C) is an international standards body which promulgates the vast majority of all technical standards governing the World Wide Web.  One of these standards is WCAG.  Version 2.0 is the most recently published.  The guidelines can be found on the web at http://www.w3.org/TR/WCAG20/.  WCAG 2.0 was formally published in 2008 and was approved as an international standard by the International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC) in 2012. *See* https://www.w3.org/2012/07/wcag2pas-pr.html.  It has been required by law in a variety of jurisdictions, including Australia, Canada, the European Union. *See* https://www.w3.org/2012/07/wcag2pas-pr.html. More recently, the United States Access Board, in its revised standards for federal agencies covered by Section 508 of the Rehabilitation Act, has adopted WCAG 2.0. *See* https://www.access-board.gov/guidelines-and- standards/communications-and-it/about-the-ict-refresh/overview-of-the-final-rule.

5.      WCAG 2.0 has received near universal acceptance by professionals working in the web accessibility and disability fields, as well as by advocacy organizations representing the blind, and other related groups.  I am unaware of the existence of any current competing standards.

6.      The WCAG has three levels of compliance: A, AA, and AAA.  Level A offers the lowest level of accessibility, and AAA offers the highest. However, the WCAG standard warns:  "It is not recommended that Level AAA conformance be required as a general policy for entire sites because it is not possible to satisfy all Level AAA Success Criteria for some content."  In practice, level AAA compliance is almost

never attempted or reached, except in rare circumstances, as it is extremely difficult to achieve, and does not substantially benefit most disabled users – particularly users who are blind. The general consensus of experts is that Level AA is the appropriate level for the vast majority of organizations to pursue, and all laws which I am aware of require this level as well, including the refreshed Section 508 agency guidelines.

7. In September 2017, Blick Art Materials, LLC ("Blick") hired A360 to assist Blick i n auditing its site and developing a plan to bring the site into substantial compliance with WCAG 2.0 AA. This work is currently underway. Blick's site now contains an accessibility statement, and the toll free number on Blick's site is readable by the use of screen reader software, including Jaws For Windows (a non-free commercial product), and non-visual desktop access ("NVDA," which is freely available to anyone at no cost). It is my opinion that these two screen readers make up the vast majority of all screen reader use in the United States, and the world. It is also my opinion that, based on how the phone number is implemented on the site, it can be easily read by any user of any modern general purpose screen reader.

8. In its audit process, which is unfolding now and will continue over the next several months, A360 will identify the issues with Blick's site that may impede accessibility for users of screen reader technology. A360 will then assist Blick in developing a plan of implementation that will prioritize accessibility issues and allow Blick's websites to become substantially compliant with the WCAG 2.0 AA standard. A360 will provide technical support and training to Blick on an as-needed basis. After implementation, A360 will re-assess Blick's site using live-user accessibility quality assurance testing to confirm that the site is usable by affected audiences, including

people who are blind, visually impaired, deaf, hearing impaired, or have other physical disabilities. Thereafter, A360 will monitor Blick's site to help ensure that it remains accessible and continues to follow and implement accessible design best practices.

9. Given the number of issues A360 has already found on the http://www.dickblick.com site, coupled with the size and complexity of the site, and the number of products on offer there, it is my opinion and experience that two years is a reasonable and not uncommon amount of time to bring this site into substantial compliance with the WCAG 2.0 AA standard. The audit process is underway, but based on information currently available, I believe Blick will be able to achieve this goal by December 31, 2019. During this period, I believe Blick's toll free number will remain accessible to visually impaired people via screen reader technology.

10. It is likely that users of the Blick website will see a major improvement in the accessibility of the site much sooner than the two year deadline. Part of the service that A360 provides to all its clients is helping them to identify the most critical issues, so they can address them first. We refer to these issues as "blockers," because they can block a large number of disabled users from completing tasks on the site. Once the blockers are addressed, A360 clients can then move on to fixing the rest of the issues that, while they may pose an inconvenience to disabled users, should not prevent them from using the major functions of the site. Rarely can a business update its site's accessibility all at once. It is much more common to implement these changes piecemeal because it gives the organization a chance to better gauge the impact of the changes, as well as helping the organization deliver incremental improvements to its customers sooner than would otherwise be possible.

I declare under penalty of perjury the foregoing is true and correct.

Dated:  November 22, 2017

Aaron Cannon